SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                    ) Arizona Supreme Court
                                     ) No. CR-99-0243-AP
                        Appellee,    )
                                     ) Pima County Superior
            v.                       ) Court
                                     ) No. CR-40086
ANDRE LAMONT MINNITT,                )
                                     )
                       Appellant.    ) **O P I N I O N**
                                     )
_____    )


Appeal from the Pima County Superior Court
No. CR-40086
The Honorable Richard D. Nichols, Judge

**VACATED WITH INSTRUCTIONS**

_____

Janet A. Napolitano, Arizona Attorney General          Phoenix
      by   Kent Cattani, Chief Counsel
           Capital Litigation Section
           Dawn Northup, Assistant Attorney General
Attorneys for Appellee


Carla Ryan                                              Tucson
Attorney for Appellant

_____

**J O N E S, Chief Justice**

¶1         The defendant, Andre Lamont Minnitt, was charged with three counts of first degree murder and seven counts of armed robbery, aggravated robbery, and burglary, all stemming from events at the El Grande Market in Tucson the night of June 24, 1992.   In 1993, Minnitt was tried and convicted of the three murder counts and the seven non-homicide counts.   He was sentenced to death for the murders.   In 1996, this court reversed the convictions and sentences and remanded the case for a new trial due to juror coercion.  *State v. McCrimmon/Minnitt*, 187 Ariz. 169, 927 P.2d 1298 (1996).   He was tried again in 1997 in a proceeding that ended in a mistrial because the jury was unable to reach a verdict.   He was tried a third time in April 1999.   There, a jury found him guilty of all charges and the trial judge imposed death sentences for the three murder convictions and life imprisonment for the armed robbery, aggravated robbery, and burglary convictions.  Because of the death sentence, direct appeal to this court is mandatory under Rules 26.15 and Rule 31.2(b) of the Arizona Rules of Criminal Procedure.   We have jurisdiction pursuant to Arizona Constitution article VI, section 5.3, and Arizona Revised Statutes (A.R.S.) section 13-4031 (Supp. 2001).

### I.  Issue Presented

¶2         Minnitt claims his third trial should have been barred by principles of double jeopardy because of prosecutorial misconduct

at the two previous trials.  Specifically, he argues that because the prosecutor engaged in egregious, intentional misdeeds aimed at prejudicing the jury and avoiding an acquittal in trials one and two, double jeopardy should apply here.

¶3        In response, the state argues that double jeopardy is not implicated, that the 1997 hung jury was not connected to the prosecutorial misconduct, and that the prosecutor did not act deliberately to avoid an acquittal.

¶4        We conclude that Arizona's constitutional protection against double jeopardy should have barred Minnitt's 1999 retrial because in both the 1993 and 1997 trials the prosecutor engaged in extreme misconduct that he knew was grossly improper and highly prejudicial, both as to the defendant and to the integrity of the system.   Moreover, the trial judge found and the record substantiates that the prosecutor did so with knowing indifference to the danger of mistrial or reversal, if not a specific intent to cause a mistrial.

## II.  The Facts

### A.  Investigation of The El Grande Homicides

¶5        Between 9:30 p.m. and 10:00 p.m. on June 24, 1992, Queen Esther Ray loaned Christopher McCrimmon a 1977 Plymouth automobile that belonged to her boyfriend, David Durbin.  She testified that McCrimmon asked to borrow the car for an hour to pick up some money. McCrimmon left with Minnitt and a third person known as

Martinez. Ray later identified Martinez as Martin Soto-Fong. She testified that all three men returned about an hour later without the car.

¶6        At approximately 10:15 p.m., Tucson police were dispatched to the El Grande Market in response to a 911 call. There, they found the bodies of three victims: the store manager, the manager's uncle, and an employee. All three died from multiple gunshot wounds. Three blocks from the market police found an abandoned Plymouth. The car was later identified as belonging to David Durbin. Christopher McCrimmon's fingerprint was found on the outside of the driver's side window.

¶7        Tucson Police Detective Joseph Godoy was assigned as the lead detective on the case. On August 31, 1992, Godoy received a phone call from an unknown male caller who told him that a black male named "McKinney" and another individual nicknamed "Cha-Chi" were involved in the El Grande Market murders. Later that evening, Godoy met with Sergeant Zimmerling, who informed Godoy that he had received a tip from a confidential informant that a black male named McCrimmon and a Mexican male named Martin Soto, also known as Cha-Chi, were involved in the murders. With this information, Godoy conducted a records check on McCrimmon, which revealed his criminal history. Further investigation by Godoy revealed that Cha-Chi, Martin Soto, and Martin Fong were names used by the same person, and that Martin Fong was a former employee of the El Grande

-4-

Market.

¶8       During this time period, Tucson Detective Fuller was investigating a late August 1992 restaurant robbery. Christopher McCrimmon became a potential suspect after forensic evidence linked him to that crime scene. Fuller discovered that Andre Minnitt, an associate of McCrimmon's, may also have been involved in the restaurant robbery. Fuller communicated this information to Godoy September 1, 1992. At that time, McCrimmon was already considered a suspect in the El Grande Market homicides, and with the additional information connecting Minnitt to McCrimmon, Godoy also considered Minnitt a possible suspect.

¶9       On September 2, 1992, Godoy assisted Fuller in arresting McCrimmon and Minnitt for the restaurant robbery. The same day, while both were in custody, Godoy questioned each of them about involvement in the El Grande homicides. Both denied involvement. Thus, as of September 2, 1992, Soto-Fong, McCrimmon, and Minnitt had been interviewed by police and were suspects in the El Grande crimes.

¶10       In late August 1992, one Keith Woods was released from prison. Several days later, he was arrested on drug charges. He was already a three-time felon, and possessing drugs was a parole violation subjecting him to a possible twenty-five year prison sentence. Facing this, Woods offered to become an informant in exchange for dismissal of the drug charges. Woods later stated

that on the day of his release from prison, he was met by McCrimmon, who professed participation in the El Grande murders. He further testified that later the same day, he and McCrimmon went to Minnitt's apartment where Minnitt and McCrimmon provided him with details of the El Grande crimes. Following an untaped interview with Godoy on September 8, Woods was transferred to a "bugged" room where, on tape, he implicated Minnitt, McCrimmon, and a third person, Cha-Chi, in the El Grande homicides. The three were subsequently charged with the murders.

## B.    Procedural History

¶11      Soto-Fong was tried separately in 1993 and, based on direct evidence of his participation in the El Grande murders, was convicted and sentenced to death. His conviction and sentence were affirmed by this court. *State v. Soto-Fong*, 187 Ariz. 186, 928 P.2d 610 (1996). Minnitt and McCrimmon were tried jointly, also in 1993, and they, too, were convicted. As noted, however, the Minnitt and McCrimmon convictions were reversed due to juror coercion, and the case was remanded for a new trial. In 1997, Minnitt and McCrimmon were retried separately. Minnitt's retrial began first, resulting in a hung jury. Days later McCrimmon was tried and acquitted.

## C.  Godoy's Misdeeds and Peasley's Misconduct

¶12      Before discussing the actual misconduct in this case, we recount the context in which it occurred. Deputy County Attorney

Kenneth Peasley conducted the 1993 Soto-Fong trial and the 1993 and 1997 trials of Minnitt and McCrimmon. He did not participate in Minnitt's 1999 trial. In all three Minnitt trials and in both McCrimmon trials, the state's case depended heavily on Keith Woods' credibility. Importantly, as of September 2, the police had identified Soto-Fong, McCrimmon, and Minnitt as suspects in the El Grande crimes and had interviewed them. But according to Godoy, police had yet to interview anyone who could provide direct evidence linking any of the three to the crimes. Woods was not interviewed until September 8, six days after the McCrimmon and Minnitt interviews. Godoy claimed to have received his first knowledge of any involvement by McCrimmon and Minnitt from his interview with Woods. This was the information the police were seeking--that McCrimmon and Minnitt had implicated themselves in the murders and that a witness would so testify.

¶13    Woods' credibility was tenuous. He was a convicted felon and drug addict who entered into an agreement with the state to provide testimony to avoid a lengthy prison sentence. The state had no plausible explanation why Godoy conducted the untaped interview with Woods. The defense strategy in the Minnitt and McCrimmon trials was to show that Godoy was the source of Woods' information about Minnitt's and McCrimmon's involvement in the case, and that during the untaped interview, he fed that information to Woods. If Godoy was indeed the source, Woods'

testimony would not have helped the state. Similarly, without Woods, the state's case would be significantly weakened because no direct or physical evidence connected Minnitt to the crime, and the credibility of the remaining witnesses was questionable.

### 1. The 1993 Joint Trial of Minnitt and McCrimmon

¶14 In 1993, Peasley began to lay the foundation for Godoy's testimony. His questioning of Godoy and his arguments to the jury indicate that he knew the case hinged on Woods' credibility. His purpose, clearly apparent, was to destroy the defense's claim that Godoy himself, not the suspects, was the source, and that Godoy had fed Woods the three names during the untaped interview. Throughout the trial he argued that Woods was believable because the only possible sources for Woods' information were the defendants themselves, not Godoy.

¶15 In his opening statement to the jury, Peasley described Godoy's investigation, stating that the detective did not know that Soto-Fong had worked at the El Grande Market until Godoy interviewed Woods on September 8. Contrary to what he knew to be true, Peasley insisted that the police did not have the names of Soto-Fong, McCrimmon, or Minnitt until after Godoy and Woods met on September 8. During his direct examination of Godoy, Peasley elicited testimony that Godoy had gone to the El Grande Market with the name of Martin Soto-Fong **only after** talking with Keith Woods. The record is replete with evidence of Peasley's full awareness

-8-

that this line of testimony was utterly false.

¶16    On redirect examination, Peasley continued to ask questions designed to mislead the jury regarding when and how Godoy discovered the defendants' names.

>   **Peasley:**  And is it fair to say that essentially the information that you began working with when Mr. McCrimmon and Mr. Minnitt and Martin Fong became suspects would have been after the time that you talked to Keith Woods in this case?
>
>   **Godoy:**  Yes.

Godoy was later recalled, whereupon Peasley continued:

>   **Peasley:**  Sir, when was the first time you became aware personally that a former employee may have been involved in the El Grande homicide?
>
>   **Godoy:**  When I spoke with Keith Woods on September the 8 of 1992.

¶17    In his closing argument, Peasley reinforced Godoy's false testimony by stating, "I told you at the beginning of the case, folks, that there would be no less than four major reasons for why you would believe Keith Woods and why you would find that these Defendants are guilty."

¶18    He continued this theme in his rebuttal statement:

>   When you look at Mr. Woods--and I would invite you to do it--if you go back in the jury room, you can look at the exhibits all you want.  The simple fact of the matter is that when you go back into the jury room, answer the question about whether or not you believe Keith Woods, about what he had to say in the case. Because if you do, the case is over, the trial is over and you can start signing the verdicts.
>
>   Because if you believe Keith Woods' testimony about

-9-

his conversations, both of these defendants have confessed to every one of these offenses. And I would ask you, again, as I did in closing arguments--or, excuse me, in opening statement go through and talk about it.

### 2. Minnitt's 1997 Retrial

¶19     Peasley continued to rely on Godoy to bolster Keith Woods' credibility in Minnitt's 1997 retrial. During direct examination of Godoy, Peasley asked a series of questions designed to erase any doubt that the source of Godoy's information could have been anyone but Woods.

> **Peasley Q:** When you first sat down and talked with Mr. Wood [sic] on September 8 of 1992, had you in your investigation come up with the name "Keith Wood"?
>
> **Godoy A:** No, Sir.
>
> **Q:** Excuse me. Had you come up with the name "Chris McCrimmon"?
>
> **A:** No.
>
> **Q:** Had you come up with the name "Andre Minnitt"?
>
> **A:** No, sir.
>
> **Q:** Had you come up with the name "Cha-chi"?
>
> **A:** No.
>
> **Q:** Had you come up with the name "Martin Fong" or "Martin Soto Fong"?
>
> **A:** No.
>
> **Q:** The first time you heard of any of those three names would have been with the conversation with Keith Wood on September 8, 1992?
>
> **A:** Yes.

**Q:** Did you in any way suggest to him what he ought to say or what he ought to tell you?

**A:** I did not, no.

The 1997 trial ended in a mistrial because the jury failed to reach a verdict. No explanation or reason was given.

### 3. McCrimmon's 1997 Retrial

¶20 McCrimmon's 1997 retrial began one week after Minnitt's trial ended in a hung jury. In a pretrial hearing just prior to McCrimmon's retrial, Godoy's false testimony in Minnitt's trial one week earlier and Peasley's knowledge of the falsehood were discovered, perhaps inadvertently, when Peasley asked the trial judge for guidance on introducing McCrimmon's involvement in the restaurant robbery and whether Godoy could refer to confidential information in his presentation of that evidence. In the course of the discussion, Peasley stated that "because of the [restaurant] case, Detective Godoy gets from Detective Fuller the name of Minnitt as associated with McCrimmon and starts wondering if they are doing [the restaurant] together . . . ." The conversation between Godoy and Fuller took place September 1, a full week before Godoy's interview with Woods. Godoy's interviews with McCrimmon and Minnitt took place September 2. It thus became apparent that Peasley had misled the Minnitt jury and that he was aware Godoy had associated Minnitt with McCrimmon prior to Godoy's September 8 interview with Woods. In response, McCrimmon's counsel submitted

a list of Godoy's false statements made in Minnitt's trial the week before and informed the court that he planned to impeach Godoy on his prior false testimony.

¶21 Knowing that McCrimmon's defense counsel would impeach Godoy, Peasley, during direct examination, had Godoy provide an accounting of his investigation. Godoy explained that his previous false testimony was derived from his fear that discussing anonymous sources could have resulted in a mistrial. "[I]n prior hearings since this, I have never been able to legally testify in court about confidential informants, and that's why I said no." Then, during redirect, Godoy stated, "Basically if I go into testimony that I received information from a confidential informant before I testify, there is a chance that that's going to be a mistrial in this case, so I didn't want to take a chance of making a mistake and having a mistrial."

¶22 In response, McCrimmon's defense counsel aggressively cross-examined Godoy by having him recount the false testimony he had given the week before in Minnitt's trial. Godoy explained Peasley's involvement and knowledge and gave a detailed accounting of his own investigation prior to his September 8 meeting with Woods. Defense counsel also reviewed the Minnitt transcripts to point out that Godoy was never asked to reveal confidential informant information. Having learned of the false testimony, the jury acquitted McCrimmon of all charges.

### 4. Minnitt's Post-Trial Motion

¶23 After McCrimmon's 1997 trial and following the not guilty verdict in which Godoy's false testimony had been revealed, Minnitt moved to dismiss the charges against him, asserting prosecutorial misconduct based on Peasley's knowing introduction of false evidence through witness Godoy in the 1993 joint trial and in Minnitt's 1997 trial. The motion was denied. Minnitt then moved to dismiss based on double jeopardy, asserting prosecutorial misconduct in eliciting false testimony from Godoy. Following an evidentiary hearing, the trial court found that the prosecutor had engaged in misconduct by posing questions that elicited false testimony in front of the jury, that the false testimony was helpful to the state's case, and that it could have been corrected by the prosecutor. The trial court rejected the double jeopardy argument that the state's conduct was intended to further an improper purpose, but nevertheless found the conduct occurred with known indifference to a significant danger of mistrial or reversal. Despite the finding of serious misconduct, the trial court denied the motion to dismiss, concluding the mistrial resulted from the jury's inability to reach a verdict, rather than from Peasley's and Godoy's misdeeds.

¶24 Following the trial court's denial of the motion to dismiss, Minnitt filed a petition for special action to this court. Special action jurisdiction is always discretionary. We declined

jurisdiction, knowing that, should Minnitt be convicted in the third trial, this court would then have the opportunity to conduct appellate review on a complete record.

### 5. Minnitt's 1999 Retrial

¶25     At Minnitt's 1999 retrial, Peasley did not participate and the prosecution altered its approach by not calling Godoy. The defense did call Godoy, however, and vigorously questioned him about his previous testimony and his role in the investigation. On cross-examination, Godoy stated that his false testimony in two prior Minnitt trials was prompted by knowledge that information from confidential sources would be hearsay and inadmissible. He gave no other justification for having given false testimony in either previous trial.

## III. Discussion

¶26     The state argues that Arizona's jurisprudence requires that a claim of double jeopardy based on prosecutorial misconduct be found without merit in the absence of a connecting link between the misconduct and the basis for mistrial. The state has mischaracterized our jurisprudence.

¶27     The double jeopardy clause of the Fifth Amendment protects a criminal defendant from multiple prosecutions for the same offense. *United States v. Dinitz*, 424 U.S. 600, 606 (1976). The Arizona Constitution provides the same protection in article 2, section 10, stating that no person shall be "twice put in jeopardy

-14-

for the same offense."  As part of the protection against multiple prosecutions, the clause protects a defendant's valued right to have his or her trial completed by the tribunal first assigned. *Oregon v. Kennedy,* 456 U.S. 667, 673 (1982) ("one of the principal threads making up the protection embodied in the double jeopardy clause is the right of the defendant to have his trial completed before the first jury empaneled to try him"); *Pool v. Superior Court*, 139 Ariz. 98, 109, 677 P.2d 261, 272 (1984).  It also protects a defendant from multiple attempts by the government, with its vast resources, "to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity . . . ." *Green v. United States*, 355 U.S. 184, 187 (1957).

¶28     Nevertheless, the protections afforded by the double jeopardy clause are not absolute. As a general rule, if the defendant successfully moves for or consents to a mistrial, retrial is not barred on double jeopardy grounds. *Dinitz*, 424 U.S. at 607; *see also United States v. Jorn*, 400 U.S. 470, 484 (1971) (double jeopardy principles "do not go so far as to compel society to so mobilize its decisionmaking resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error"); *Kennedy*, 456 U.S. at 672-73 (the circumstances surrounding termination of the first trial dictate

-15-

whether the double jeopardy clause bars retrial).  The rationale for the rule permitting re-prosecution is that the defendant, either on his own motion or by his consent, has agreed to forego his right to a final determination by the first tribunal.  *Dinitz*, 424 U.S. at 607-08.

¶29     There are circumstances, however, in which the double jeopardy clause will bar re-prosecution.  Intentional and pervasive misconduct on the part of the prosecution to the extent that the trial is structurally impaired is one example.  In *Pool* we held that retrial is barred when the prosecutor engages in improper conduct that is not merely the result of legal error or negligence, but constitutes intentional conduct that the prosecutor "knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal [ ] and the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial." *Pool*, 139 Ariz. at 108-09, 677 P.2d at 271-72.  Our decision in *Pool* was based on the view that a defendant's constitutional guarantee to be free from multiple trials would be severely impaired by the prosecutor's intentional misconduct.

¶30     In deciding *Pool*, we drew an important distinction between simple prosecutorial error, such as an isolated misstatement or loss of temper, and misconduct that is so egregious that it raises concerns over the integrity and fundamental fairness

of the trial itself. *Id*. at 105-07, 677 P.2d at 268-70. Prosecutorial misconduct that permeates the process and intentionally destroys the ability of the tribunal to reach a fair verdict must necessarily be remedied.

¶31    The misconduct in *Pool* was extreme.  During cross-examination of the defendant regarding the theft at issue, the prosecutor's questions ranged from irrelevant and prejudicial to abusive, argumentative, and disrespectful. Permanent prejudice became clear by reason of the prosecutor's persistence in improper cross-examination.   Ultimate fairness in the trial became impossible to achieve.   Given this conduct, we concluded unanimously that the prosecutor's purposes, apparent from the record, were to avoid an acquittal, prejudice the jury, and obtain a conviction with indifference to the danger of mistrial or reversal. *Id*. at 109, 677 P.2d at 272.  Accordingly, the double jeopardy doctrine barred retrial.

¶32    Consistent with these principles, in a more recent decision, this court determined that, even in the absence of a declared mistrial, double jeopardy bars retrial in situations where the trial became patently unfair and the conviction was obviously obtained by intentional prosecutorial misconduct. *State v. Jorgenson,* 198 Ariz. 390, 10 P.3d 1177 (2000).[1]  The defendant's

---

[1] *Jorgenson* was a petition for special action that arose from our reversal of the convictions and sentences imposed on one Alex Hughes by reason of prosecutorial misconduct. *See State v. Hughes*,

motion for mistrial based on the prosecutor's misdeeds was denied. On appeal, we reversed and remanded the case because the prosecutor had engaged in "knowing and intentional misconduct." *Id.* at 390-91, 10 P.3d at 1177-78 ¶2. We stated,

> [t]he misconduct includes "ignoring the facts . . . , [and] relying on prejudice . . . ." It was "a dishonest way to represent the State . . . , and it was especially dishonest . . . where the evidence of insanity was substantial, and where the State had no evidence that [Defendant] had fabricated an insanity defense." . . . The state overwhelmed Defendant's insanity defense, "but it did not do so with evidence; it did so with prosecutorial misconduct."

*Id.* (internal citations omitted) (quoting *State v. Hughes*, 193 Ariz. 72, 86-88, 969 P.2d 1184, 1198-1200 ¶¶61-73 (1998)).

¶33    On remand, the defendant moved to dismiss on double jeopardy grounds and the trial court granted the motion. The state then sought special action relief, claiming the defendant was entitled only to a new trial, not dismissal.

¶34    On review of the special action, we reasoned it would be contrary to established double jeopardy principles to draw a meaningful legal distinction between re-prosecution following a mistrial and re-prosecution after reversal on appeal from the erroneous denial of a mistrial. This court said, "Surely a defendant whose mistrial motion was erroneously denied, as in the present case, should have the same constitutional protection as one whose motion was correctly granted, as in *Pool*." *Id.* at 392, 10

---

193 Ariz. 72, 969 P.2d 1184 (1998).

-18-

P.3d at 1179 ¶7.

¶35    Thus, where a prosecutor, as in the case before us, engages in egregious conduct clearly sufficient to require a mistrial but manages to conceal his conduct until after trial, the same circumstance is presented as in *Pool* and *Jorgenson* and the same reasoning applies.  Concealment of a prosecutor's serious misdeeds throughout the trial should not expose the defendant to multiple trials.  "This is exactly what the double jeopardy provision was intended to prevent."  *Jorgenson*, 198 Ariz. at 392, 10 P.3d at 1179 ¶6.

¶36    The state argues that in order for double jeopardy to bar retrial, the prosecutor's misconduct must be blatant, and the misconduct and request for a mistrial must be inextricably connected.  It claims the misconduct in this case was not serious because defense counsel failed to move for a mistrial before the case was submitted to the jury.  We disagree.  The protections afforded by the double jeopardy clause do not turn on whether the state's overreaching is apparent during trial.  The state has provided no reason, nor do we see one, that justifies differentiating those acts of misconduct that become apparent or are discovered only after the trial from acts of misconduct that are obvious when committed and therefore capable of an immediate remedy.

¶37    The state contends also that the prosecutor's misconduct

-19-

in this case is considerably more limited than the misconduct in either *Pool* or *Jorgenson*. Again, we disagree. Misconduct at least as serious as that in *Pool* and *Jorgenson* is undeniably present in the matter before us. Like the misdeeds in *Pool*, Peasley's misdeeds were not isolated events but became a consistent pattern of prosecutorial misconduct that began in 1993 and continued through retrial in 1997. The prosecutor knowingly and repeatedly misled the jury as to how, when, and from whom Godoy first learned the names of the three defendants. By allowing the jury to believe that Woods was the initial source, the state avoided the credibility obstacle that would have been apparent had Godoy himself been the source. It is clear that Godoy testified falsely and that his testimony was used to bolster the credibility of the state's key witness. Moreover, the record establishes that Peasley knew the testimony was false and not only failed to clarify the mistake but argued the evidentiary point to the jury. Peasley's calculated deception reveals the actual weakness of the state's case. His only explanation was that he forgot the correct sequence of events and that during the 1997 trial his health was poor.

¶38    Moreover, Peasley admits his mistakes but surprisingly claims they do not amount to misconduct. The argument is not persuasive. Peasley is not an inexperienced prosecutor, but rather a veteran homicide prosecutor. He elicited testimony from Godoy that he knew was false, and he knew what he was doing.

Deliberately posing unfounded and misleading questions to bolster the credibility of a witness and then arguing each point to the jury during a capital trial constitutes prosecutorial misconduct that violates the most elementary principles. Our review of the record supports the conclusion, not unlike that in *Pool* and *Jorgenson*, that the prosecutor engaged in a pattern of intentional misconduct in the 1993 and 1997 trials aimed at preventing an acquittal and serving to deprive the defendant of a fair trial. On this record, we cannot say the 1997 mistrial in Minnitt's case was not directly caused by Peasley's misconduct. Indeed, just a week later, McCrimmon's jury, having learned of Godoy's misstatements and Peasley's misdeeds, returned a verdict of acquittal.

¶39      The state also claims double jeopardy does not apply because the defense was aware the testimony was false and failed to do anything about it during trial. Defense counsel responded adequately by stating he chose not to challenge the false testimony in order to avoid inevitable prejudice caused by information about a prior conviction and an anonymous informant.

¶40      Thus, during a bench conference in 1993, Peasley indicated that if defense counsel inquired into the information Godoy had prior to meeting with Keith Woods, then the door would be opened to discussing the restaurant robbery and other inadmissible sources implicating the defendants. Peasley used his position, in effect, to bully the defense into submission by threatening to use

-21-

this information. Realizing defense counsel would not challenge his course of action, Peasley persisted in using the false testimony to his advantage.

¶41    Defense counsel's knowledge of the Godoy falsehood does not nullify the prosecutor's behavior. We have routinely noted that a prosecutor has an obligation not only to prosecute with diligence, but to seek justice. He must refrain from all use of improper methods designed solely to obtain a conviction. *State v. Bible,* 175 Ariz. 549, 600, 858 P.2d 1152, 1203 (1993) (While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.") (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *Pool*, 139 Ariz. at 103, 677 P.2d at 266. The prosecutor has a duty to see that all defendants receive a fair trial. *State v. Cornell*, 179 Ariz. 314, 331, 878 P.2d 1352, 1369 (1994). Here, Peasley was indifferent to that duty.

¶42    Moreover, Godoy's explanation that he testified falsely to protect confidential sources or to avoid a hearsay problem appears pretextual. All he or Peasley had to do to correct matters was to admit knowledge of Minnitt as a suspect prior to the September 8 interview between Godoy and Woods and the truth would have been on the record as it should have been, even if at the

expense of Woods' credibility.

¶43     This case is an anomaly; egregious prosecutorial misconduct occurred in Minnitt's first two trials, but the third trial, conducted by a new prosecutor and allegedly free of misconduct, resulted in a conviction.  We note, however, that whether or not the third trial was free from false testimony, falsehoods in the two previous trials permeated the process to the extent that fairness in the third trial could not correct the misdeeds of trials one and two.[2]

¶44     In most instances, the remedy for prosecutorial misconduct is a new trial.  *See State v. Towery*, 186 Ariz. 168, 185, 920 P.2d 290, 307 (1996); *State v. Atwood*, 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992).  However, the record in the instant case is now replete with evidence that the prosecutor, with full knowledge, introduced false testimony in two trials and thus seriously damaged the structural integrity of both.  The inevitable conclusion is that the prosecutor was aware that his actions would deprive Minnitt of a fair trial.  We announce today's ruling not to

---

[2] While the errors in the 1999 trial have no bearing on our decision, we believe it is necessary to mention briefly the shortcomings of that trial.  The state's failure to disclose the drug arrest of an important witness and its untimely disclosure of several witnesses the day before trial and after *voir dire* violated Rule 15.  In addition, during summation in trial three, the state improperly argued that McCrimmon was "pretty close to guilty beyond a reasonable doubt."  This reference was misleading and highly improper because McCrimmon had been acquitted and the prosecutor knew it.

sanction the prosecutor, but to protect the integrity of the justice system.

## IV. Conclusion

**¶45** For the reasons discussed, we hold that Minnitt's 1999 retrial was barred by the double jeopardy clause of the Arizona Constitution. We therefore vacate the convictions and sentences entered at the conclusion of the 1999 trial and instruct the trial court to dismiss the charges against Minnitt with prejudice.[3]

_____
Charles E. Jones
Chief Justice

CONCURRING:

_____          _____
Ruth V. McGregor, Vice Chief          Stanley G. Feldman, Justice
    Justice


_____          _____
Rebecca White Berch, Justice          Michael J. Brown, Judge (retired)

---

[3] In the unrelated case involving the robbery of a Tucson restaurant, a jury found Minnitt guilty of attempted second degree murder, two counts of attempted armed robbery, three counts of aggravated assault, and one count of burglary. He received concurrent sentences of imprisonment on five of the counts, the longest for twenty-one years. As to the remaining two counts, the trial court imposed concurrent fifteen-year sentences, to be served consecutively to his sentences on the other five counts. Today's decision shall have no effect on Minnitt's convictions and sentences stemming from the restaurant robbery.

NOTE: Due to a vacancy on this court at the time this case was decided, the Honorable Michael J. Brown, a retired judge of the Superior Court of Arizona in Pima County, was designated to participate in this case under article VI, § 3 of the Arizona Constitution.