**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARTÍN RAÙL FONG SOTO, *Petitioner-Appellant*, v. CHARLES L. RYAN and CHARLES GOLDSMITH, Warden, *Respondents-Appellees*. | No. 11-17051 D. Ct. No. CV-04-68-TUC-DCB OPINION |

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
September 10, 2013—San Francisco, California

Filed July 25, 2014

Before: Mary M. Schroeder and Jay S. Bybee, Circuit
Judges, and Robert J. Timlin, Senior District Judge.[*]

Opinion by Judge Timlin;
Dissent by Judge Schroeder

---

[*] The Honorable Robert J. Timlin, Senior District Judge for the U.S.
District Court for the Central District of California, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's denial of an Arizona state prisoner's 28 U.S.C. § 2254 habeas corpus petition challenging convictions of murder, robbery and attempt, and aggravated robbery and attempt arising from a triple homicide.

The panel held that the Arizona courts did not engage in an unreasonable determination of the facts or an unreasonable application of controlling federal law when denying the petitioner's claim under *Napue v. Illinois* that the prosecution knowingly elicited and used the false testimony of a detective regarding when the petitioner became a suspect in this case.

The panel held that the Arizona courts likewise did not engage in an unreasonable determination of facts or an unreasonable application of controlling federal law when denying petitioner's claim that his trial counsel provided ineffective assistance of counsel by calling as a witness, in pursuit of a mistaken-identity defense, a state informant who otherwise would not have testified at the trial.

Dissenting, Judge Schroeder wrote that the petitioner did not receive a fair trial and the district court should have granted him habeas relief because the jury convicted the petitioner after a trial marked by perjury and incompetence.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Amy Armstrong and Emily Skinner, Arizona Capital Representation Project, Tucson, Arizona, for Petitioner-Appellant.

Thomas C. Horne, Attorney General; Kent E. Cattani, Division Chief Counsel; Joseph T. Maziarz, Section Chief Counsel; Aaron J. Moskowitz, Assistant Attorney General, Criminal Appeals/Capital Litigation Division, Phoenix, Arizona, for Respondents-Appellees.

Professor Susan Martyn, University of Toledo College of Law, Toledo, Ohio; Emeritus Professor Gary Lowenthal, Arizona State University, Tempe, Arizona, for Amicus Curiae Ethics Bureau at Yale.

## OPINION

TIMLIN, District Judge:

Arizona state prisoner Martín Raùl Fong Soto ("Petitioner" or "Fong")[1] appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging his jury convictions of murder, robbery and attempt, and aggravated robbery and attempt arising from a triple homicide. A separate jury convicted Petitioner's co-defendants, Christopher McCrimmon ("McCrimmon") and Andre Minnitt ("Minnitt"), of similar charges in later prosecutions brought by the same prosecutor in Petitioner's case. However, McCrimmon was acquitted after his second trial and Minnitt's convictions were vacated after three trials once prosecutorial misconduct during Minnitt's and McCrimmon's first two trials was uncovered. Specifically, the prosecutor was found to have knowingly elicited from Detective Joseph Godoy of the Tucson Police Department false testimony about how and when the three defendants became suspects in the case in order to bolster the credibility of the key state witness, Keith Woods, whose testimony tied the defendants to the crime. The prosecutor was later disbarred for his misconduct.

Petitioner raises two certified claims on appeal. First, he contends that the Arizona courts unreasonably rejected his claim that, during his trial, the prosecution also knowingly

---

[1] Though previous case captions in this matter have referred to Petitioner as "Martin Soto Fong," the Court recognizes that before the district court, Petitioner identified his actual name as Martín Raùl Fong Soto, or, more commonly, Martín Fong, and that Petitioner captions his filings with this Court in accord with that representation.

elicited and used the false testimony of Detective Joseph Godoy regarding when Petitioner became a suspect in this case in order to secure his conviction. Second, he argues that the Arizona courts unreasonably rejected his claim that his counsel was ineffective for calling state informant Keith Woods ("Woods") as a witness when Woods otherwise would not have testified at Petitioner's criminal trial.[2]

We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Crimes of Conviction

Petitioner's convictions arose out of the June 24, 1992 lethal shootings at the El Grande Market in Tucson, Arizona, of Fred Gee ("Gee," the market manager), Ray Arriola (a market employee), and Zewan Huang (Gee's elderly uncle). *State v. Soto-Fong*, 928 P.2d 610, 614 (Ariz. 1996). Shortly after the shootings, police found an abandoned car three blocks from the market. *Id*. The car had been left mid-turn, rather than parked near the curb. *Id*. at 624–25. The doors were unlocked, the rear windows rolled down, and the hood was warm to the touch. *Id*. at 625. McCrimmon's fingerprint was found on the driver's side window. *Id*. at 614, 625.

The market was in the process of closing at the time the murders took place. *Id*. at 615. Gee's body was found near the open cash register at the liquor counter. The cash register

---

[2] Fong also raises a number of uncertified issues in his opening brief, which we address separately in a concurrently filed memorandum disposition.

had a sale rung up on it, and nearby on the counter were bags containing a cucumber and three lemons. *Id*. Petitioner's fingerprints were found on the bags. *Id*. Also, on the floor near Gee's body were two foodstamps not yet stamped with the market's name. Petitioner's fingerprint was found on one of the stamps. *Id*. At least $175.52 was missing from the store. *Id*.

## B. State Informant Keith Woods and Information about a "Chachi"

Shortly after being released from prison in late August 1992, Woods was arrested by Tucson police on a drug charge. *Id*. In exchange for his release and the dismissal of that charge, which could have subjected Woods to 25 years in prison, Woods agreed to act as a state informant. *Id*. at 616. On September 8, 1992, the lead homicide detective in the El Grande murder case, Joseph Godoy ("Godoy" or "Detective Godoy"), interviewed Woods because of information Woods represented he had about the triple homicide. *Id*. at 615. Godoy initially engaged in an untaped interview with Woods that lasted approximately 30 to 45 minutes, after which police transferred Woods to a "bugged" room in order to tape his statement. *State v. Minnitt*, 55 P.3d 774, 777 (Ariz. 2002).

During the taped portion of the interview, Woods stated that McCrimmon and Minnitt had confessed to him that they had completed the El Grande murders with a third person identified as "Cha-Chi"[3] who used to work at the market. Woods stated that Chachi "masked down or whatever" during

---

[3] The Court utilizes the spelling "Chachi" when not directly quoting another court decision, the parties' pleadings, or the excerpts of record, all of which include varied spellings and capitalizations of that name.

the shooting. Woods also represented that he had never seen or met Chachi before and could not describe what Chachi looked like. Woods relayed that McCrimmon and Minnitt confessed to him on the first day that Woods was released from prison in late August 1992.

Woods' September 8, 1992 statement was not the first date on which Detective Godoy learned of a Chachi being a possible suspect in the El Grande murders. In an investigative report dated September 9, 1992, Godoy stated that on August 31, 1992, he received a call from an unknown male who stated that "Martin Soto and a black guy named McKinney" committed the shootings. According to the September 9, 1992 report, later that same day, a Detective Zimmerling ("Zimmerling") advised Godoy that a female confidential informant represented that "a Hispanic male named Chachi and a black male named Christopher McCrimmon" were involved in the triple homicide. Godoy went on to relate in his report that on September 1, 1992, he obtained information from the Tucson Police Department's Gang Unit that Petitioner Fong was an associate of McCrimmon's, that his AKA was Martin Soto, and that he also went by the name Chachi.

In another investigative report dated September 15, 1992, Godoy related slightly different facts about when and from whom he learned about a Chachi. For example, in this subsequently dated report, Godoy related that on August 31, 1992, the unknown male caller identified McKinney and a Chachi (not a Martin Soto) as involved in the El Grande murders. Godoy also related that on that same day, Zimmerling called to state that a confidential informant had identified as suspects a black male known as Christopher McCrimmon and a Mexican male known as Martin Soto or

Chachi. In the report, Godoy represented that he then completed a records check on Christopher McCrimmon and Martin Soto, but that no information came back on a Martin Soto.

As a result, Godoy went to the El Grande Market to see if Tommy Gee, a relative of the deceased market manager, recognized either name. Tommy Gee said that he did not but that an individual named Martin Fong, *i.e.*, Petitioner, used to work at the market. Godoy stated in his report that he then completed a records check on Martin Fong which was successful and revealed that Martin Fong used the name Martin Soto. Godoy also related that the next day, on September 1, 1992, Detective Fuller with the Tucson Police Department told him that McCrimmon was best friends with an individual named Martin Fong or Martin Soto.

As reflected in the September 15, 1992 report, on September 2, 1992, Detective Godoy helped Detective Fuller arrest Minnitt and McCrimmon for a robbery committed in Tucson at Mariano's Pizzeria on August 26, 1992. Detective Godoy questioned each of them about their involvement in the El Grande murders, and both denied any involvement in those murders or in the Mariano's Pizzeria robbery. McCrimmon also denied having seen Fong recently, and Minnitt claimed not to know Fong at all.[4] Nonetheless, after a forensic identification technician concluded on September 10, 1992, that Fong's fingerprints matched those found on certain items at the El Grande Market crime scene, Petitioner was arrested on September 11, 1992.

---

[4] State informant Keith Woods also was told by police on September 8, 1992, that he was a suspect in the Mariano's Pizzeria robbery, before he offered to provide detectives with information on the El Grande murders.

Detective Godoy completed a second interview with Woods on November 20, 1992. On that date, the police apprehended Woods after he had gone into hiding for a few weeks in an attempt to renege on his deal to aid law enforcement in the prosecution of the El Grande homicides. This interview also began with an untaped portion. In the taped portion of the interview, Woods began by continuing to represent that when Minnitt and McCrimmon confessed to him, they only referred to the third individual as "Chachi." Woods also related that McCrimmon and Minnitt told Woods that Chachi made the plans to commit the robbery at the market because he used to work there, and he could get them inside because the market employees would recognize him.

Woods went on to tell Godoy that he had met Chachi at the house of McCrimmon's girlfriend, Bridget Lucero, on a date after McCrimmon and Minnitt had been arrested in early September 1992 in connection with the Mariano's Pizzeria case. As a result, Woods said that he could now identify Chachi as Petitioner because Woods had also seen Petitioner on television after Petitioner was arrested for the El Grande murders on September 11, 1992 (though on September 8, 1992, Woods claimed to have never met Chachi).

Later in the interview, when Godoy again referred to Woods meeting Chachi, Woods stated that "they" were actually calling him Martin, not Chachi, and that Woods was not sure if Martin and Chachi were two different people. Then, for the first time, Woods specifically related that, during McCrimmon and Minnitt's joint confession to him on the day that he was released from prison, McCrimmon had talked about committing the homicides with a guy named "Martin" and "Chachi." Woods again repeated that he was not sure if Martin and Chachi were the same person. At that

point in the interview, Godoy then identified "Martin's" girlfriend as Betty Christopher (Petitioner's girlfriend) and asked Woods if he knew Betty Christopher; Woods answered in the affirmative.

Petitioner's attorney, James Stuehringer ("Stuehringer"), conducted a March 4, 1993 pretrial interview of Woods. During that interview, Woods expressly stated that McCrimmon and Minnitt had told him during their joint confession to the El Grande murders that "Martin" and "Chachi" had committed the crime with them, and that both names referred to a single person, Betty Christopher's boyfriend. During this interview, Woods also receded from his September 8, 1992 statement that Chachi wore a mask during the commission of the murders. That is, he indicated that he only assumed Chachi wore a mask but had not explicitly been told that by McCrimmon or Minnitt. Woods also told Stuehringer that McCrimmon had told him that Chachi lived behind a Circle K off of a street called Prince.

## C. Petitioner's State Court Trial

The prosecution's theory of the case was that, as an undisputed former El Grande Market employee, Fong exploited the store employees' recognition of him to gain access to the store while it was in the process of closing, enabling him, Minnitt and McCrimmon to commit the charged crimes. *See*, *e.g.*, *Soto-Fong*, 928 P.2d at 620. However, the state did not plan to call Woods as a witness in Petitioner's case because Fong was not present when McCrimmon and Minnitt allegedly confessed to Woods, raising Sixth Amendment confrontation clause issues under *Bruton v. United States*, 391 U.S. 123 (1968).

Petitioner's attorney nonetheless listed Woods as a defense witness in order to support a primary defense theory of mistaken identity: that Chachi was not Petitioner but Martin Garza, a close friend of McCrimmon's with the nickname "Chachi." *Soto-Fong*, 928 P.2d at 615. Stuehringer likewise filed a motion in limine asking the trial court to limit the scope of Woods' testimony to his September 8, 1992 statement wherein he implicated a former El Grande employee named Chachi but failed explicitly to identify Chachi as Petitioner.

The judge denied Stuehringer's motion in limine and ruled that, if Woods testified, all of his statements to law enforcement about McCrimmon's and Minnitt's joint confession to him, including Woods' November 20, 1992 statement, would be admissible at trial. *Soto-Fong*, 928 P.2d at 616–17. Stuehringer still decided to call Woods as a witness, who went on to testify, *inter alia*, to the contents of his September 8 and November 20, 1992 statements. *Soto-Fong*, 928 P.2d at 620 (noting that Woods testified that "the third murderer was 'Martin,' 'the Mexican dude,' who 'used to work there[.]'"); *see also id.* at 624. During trial, Woods also expressly stated that McCrimmon and Minnitt told him when they confessed to the crimes that Martin was Betty Christopher's boyfriend, consistent with his statement to Stuehringer during the March 4, 1993 pretrial interview. *Id*. at 624. And Woods related that he understood Chachi to be Petitioner after meeting him at Bridget Lucero's house.

As part of the mistaken identity defense, Stuehringer also introduced evidence that Petitioner had never been known as "Cha-Chi." *Id*. at 616 n.2. Stuehringer likewise called Martin Garza as a witness and elicited from him that his nickname was Chachi, that he and McCrimmon were friends

who lived around the corner from one another, that McCrimmon called him Chachi, and that he lived near the Circle K off of a street called Prince. Moreover, Stuehringer elicited from Detective Godoy that, after his September 8, 1992 meeting with Woods but before November 20, 1992, Godoy misstated in a telephonic search warrant affidavit and under oath during a juvenile court transfer hearing that Woods had identified Petitioner as Chachi, that Petitioner confessed to the crimes, and that Petitioner had the murder weapon. As a result, Stuehringer argued to the jury that Godoy had an incentive to feed Woods additional incriminating information connecting Chachi to Petitioner when Godoy and Woods met for the second time on November 20, 1992, after Woods had gone into hiding. As another part of the defense strategy, Stuehringer presented evidence and argument that the detectives, including Detective Godoy, misrepresented and mishandled the fingerprint evidence implicating Petitioner, making that evidence unreliable. *Soto-Fong*, 928 P.2d at 615, 621.

In addition to the testimony from defense witness Woods and the state's presentation of the fingerprint evidence linking Petitioner to the crime scene, the jury also heard from a primary state witness named Queen E. Ray ("Ray"). Ray testified that she loaned the abandoned car found near the El Grande shootings with McCrimmon's fingerprint on it to McCrimmon in return for money on the evening of the El Grande shootings. *Id.* at 614. She further testified that McCrimmon, Minnitt, and a third person, whom she knew as "Martinez," left McCrimmon's apartment with the car around 10:00 p.m. *Id.* She identified Petitioner as Martinez during trial. *Id.* at 614–15. She went on to testify that McCrimmon, Minnitt, and Petitioner returned to McCrimmon's apartment about an hour after she loaned them the car, without the car,

and that McCrimmon gave her $30 and the car keys. *Id*. at 615.

Petitioner, seventeen at the time the crimes were committed, was convicted on all counts except a burglary count and ultimately sentenced to death. *Soto-Fong*, 928 P.2d at 615.

## D. State Misconduct and the Trials of Petitioner's Co-Defendants

Petitioner's co-defendants, McCrimmon and Minnitt, were tried three weeks later. During that joint trial, the prosecutor in the El Grande murder cases, Kenneth Peasley ("Peasley"), represented during his opening and closing statements that Godoy did not have the names of Petitioner, McCrimmon, or Minnitt until he met with Woods on September 8, 1992, and also stated that Godoy did not suspect a former market employee or know that Petitioner worked at the El Grande Market until he interviewed Woods; Godoy gave testimony consistent with Peasley's representations. *Minnitt*, 55 P.3d at 778. Both Minnitt and McCrimmon were convicted and sentenced to death. However, McCrimmon's and Minnitt's initial convictions were overturned on appeal because of jury coercion, while Petitioner's convictions were affirmed on direct review. *State v. McCrimmon*, 927 P.2d 1298, 1303 (Ariz. 1996); *Soto-Fong*, 928 P.2d at 635.

Meanwhile, the state retried Minnitt and McCrimmon in separate trials. Minnitt's 1997 initial retrial resulted in a hung jury. *Minnitt*, 55 P.3d at 777. During that trial and in line with questions asked during the 1993 joint trial, Peasley repeatedly elicited testimony from Godoy that Godoy did not suspect McCrimmon, Minnitt, Fong or a "Cha-chi" of

committing the El Grande murders until Godoy spoke with
Woods on September 8, 1992. *Id*. at 779. At McCrimmon's
1997 retrial, his defense counsel confronted Godoy about this
testimony, and Godoy admitted that it was false but that he
feared causing a mistrial by improperly revealing information
obtained from confidential informants. *Id*. McCrimmon was
acquitted.

Minnitt was then tried for the third time by a different
prosecutor and was convicted again in 1999. *Id*. at 776, 780.
But, on October 11, 2002, the Arizona Supreme Court
vacated his conviction and held that his latest retrial should
have been barred under the double jeopardy clause of the
Fifth Amendment because of Peasley's repeated and knowing
use of false testimony during Minnitt's prior two trials. *Id*. at
783.

In summarizing the context of the prosecutorial
misconduct, the Arizona Supreme Court recounted the
following:

> Before discussing the actual misconduct in
> this case, we recount the context in which it
> occurred. Deputy County Attorney Kenneth
> Peasley conducted the 1993 Soto-Fong trial
> and the 1993 and 1997 trials of Minnitt and
> McCrimmon. He did not participate in
> Minnitt's 1999 trial. In all three Minnitt trials
> and in both McCrimmon trials, the state's
> case depended heavily on Keith Woods'
> credibility. Importantly, as of September 2,
> the police had identified Soto-Fong,
> McCrimmon, and Minnitt as suspects in the El

Grande crimes and had interviewed them.[5] But according to Godoy, police had yet to interview anyone who could provide direct evidence linking any of the three to the crimes. Woods was not interviewed until September 8, six days after the McCrimmon and Minnitt interviews. Godoy claimed to have received his first knowledge of any involvement by McCrimmon and Minnitt from his interview with Woods. This was the information the police were seeking-that McCrimmon and Minnitt had implicated themselves in the murders and that a witness would so testify.

Woods' credibility was tenuous. He was a convicted felon and drug addict who entered into an agreement with the state to provide testimony to avoid a lengthy prison sentence. The state had no plausible explanation why Godoy conducted the untaped [portion of the September 8] interview with Woods. The defense strategy in the Minnitt and McCrimmon trials was to show that Godoy was the source of Woods' information about Minnitt's and McCrimmon's involvement in the case, and that during the untaped interview, he fed that information to Woods. If Godoy was indeed the source, Woods' testimony would not have helped the state.

---

[5] Contrary to how this statement reads, only Minnitt and McCrimmon were interviewed prior to Godoy's September 8, 1992 interview with Woods. Godoy did not interview Petitioner until September 9, 1992.

Similarly, without Woods, the state's case would be significantly weakened because no direct or physical evidence connected Minnitt to the crime, and the credibility of the remaining witnesses was questionable.

*Id*. at 777–78.

In summarizing the extent of the misconduct, the Arizona Supreme Court further concluded:

Peasley's misdeeds were not isolated events but became a consistent pattern of prosecutorial misconduct that began in 1993 and continued through retrial in 1997. The prosecutor knowingly and repeatedly misled the jury as to how, when, and from whom Godoy first learned the names of the three defendants. By allowing the jury to believe that Woods was the initial source, the state avoided the credibility obstacle that would have been apparent had Godoy himself been the source. It is clear that Godoy testified falsely and that his testimony was used to bolster the credibility of the state's key witness. Moreover, the record establishes that Peasley knew the testimony was false and not only failed to clarify the mistake but argued the evidentiary point to the jury. Peasley's calculated deception reveals the actual weakness of the state's case.

*Id*. at 782.

Because of his misconduct in the McCrimmon and Minnitt trials, Peasley was disbarred. *In re Peasley*, 90 P.3d 764, 781 (Ariz. 2004).

### E. Petitioner's Post-Conviction Relief Proceedings in State and Federal Court

Fong filed his first state postconviction relief ("PCR") petition in Arizona Superior Court on August 20, 1999. That petition included, *inter alia*, a claim alleging prosecutorial misconduct based on perjury by Detective Godoy akin to that ultimately found to have occurred in Minnitt's and McCrimmon's trials. It also included a claim alleging ineffective assistance of counsel because of Stuehringer's decision to call Keith Woods as a defense witness.

During evidentiary hearings occurring in January and August 2001, Stuehringer testified about his defense strategy, and Peasley testified about the prosecutorial misconduct and certain *Brady v. Marlyand* allegations. Because Godoy was under indictment for perjury stemming from McCrimmon's and Minnitt's trials at that time, he invoked his rights under the Fifth Amendment and refused to testify at the evidentiary hearings.

Prior to issuing a ruling on the petition, Fong's assigned state court judge died, and when a new judge was assigned to the matter, the parties agreed that a number of issues raised by Fong could be decided without further evidentiary development. After those claims were resolved and denied in a June 27, 2002 order, the superior court then held another evidentiary hearing on Petitioner's remaining claims in August 2002. Godoy again did not appear as a witness due to his intention to invoke the Fifth Amendment if so called, even

though he no longer was under indictment for his conduct in McCrimmon's and Minnitt's prosecutions. In an October 7, 2002 ruling, the Arizona Superior Court denied Petitioner's remaining claims, including his prosecutorial misconduct claim based on Godoy's alleged perjury and his claim for ineffective assistance of counsel based on Stuehringer's decision to call Woods as a defense witness.

Fong filed two more PCR petitions in state superior court and engaged in a number of related state appellate proceedings in a continued effort to challenge his conviction and sentence. While he successfully had his death sentence vacated as a result of the United States Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005), he obtained no other relief in state court, and the October 7, 2002 Arizona Superior Court ruling remains the last reasoned state court decision on the two certified issues addressed herein.

Fong's federal habeas petition asserted 24 claims for relief. On August 5, 2011, the district court found that Petitioner was not entitled to habeas relief on any of his claims. However, it issued a certificate of appealability on the two issues addressed in the instant opinion after finding that Petitioner had not met the requirements for habeas relief under 28 U.S.C. § 2254(d) for claims adjudicated on the merits in state court proceedings.

## II. STANDARD OF REVIEW

Because Fong filed his federal habeas petition after April 1, 1996, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to his claims. *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S. Ct. 2059 (1997). Under the AEDPA, a

federal court can grant relief only if the state court's adjudication of a petitioner's claim on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if the state proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The AEDPA sets forth a "highly deferential standard for evaluating state-court rulings," *Lindh*, 521 U.S. at 333 n.7, and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357 (2002).

On federal habeas review, the court "look[s] through unexplained state court decisions leaving, in effect, the denial of post-conviction relief to the last reasoned state court decision to address the claim at issue." *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007) (en banc). A state court renders a decision "contrary to" federal law if it reaches "a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S. Ct. 1495 (2000).

A state court unreasonably applies federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. Under the "unreasonable application" inquiry, "the state court decision [must] be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003). Instead, the decision must be "objectively unreasonable." *Id*.; *see also*

*Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was *so lacking in justification* that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." (emphasis added)).  This same standard of unreasonableness applies to state court factual determinations under 28 U.S.C. § 2254(d)(2).  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (citing *Torres v. Prunty*, 223 F.3d 1103, 1107–08 (9th Cir. 2000)); *see also Murray v. Schriro*, __F.3d__, 2014 WL 997716, *11 (Mar. 17, 2014 9th Cir. 2014) ("[W]e may only hold that a state court's decision was based on an unreasonable determination of the facts if 'we [are] convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.'" (alternation in original) (quoting *Taylor*, 366 F.3d at 1000)).

This Court reviews de novo a district court's denial of habeas corpus relief.  *Tanner v. McDaniel*, 493 F.3d 1135, 1139 (9th Cir. 2007).  The district court's factual findings are reviewed for clear error.  *Allen v. Woodford*, 395 F.3d 979, 992 (9th Cir. 2005).

## III.   DISCUSSION

### A. Alleged *Napue* Violation

In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court held "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  Under

this clearly established Supreme Court precedent, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material. *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003); *see also Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (the state cannot allow a witness to give a material false impression of the evidence). "In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (citing *Alcorta* and *Pyle v. Kansas*, 317 U.S. 213 (1942)).

False testimony is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id*. (internal quotations and citation omitted). "Under this materiality standard, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. (alteration in the original) (internal quotations and citation omitted); *see also Dow v. Virga*, 729 F.3d 1041,1048 (9th Cir. 2013) ("*Napue* requires us to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error *would* have done so." (emphasis in original)).

On appeal, Petitioner asserts that the prosecution built its case on false testimony by Detective Godoy implying that he did not suspect Petitioner, Minnitt, or McCrimmon of committing the El Grande homicides until he first spoke with

Woods on September 8, 1992. Petitioner contends that because this testimony left the jury with the false impression that Woods was the original source of Godoy's suspicion of Fong, it bolstered the credibility of Godoy and Woods and discredited the defense argument that Godoy told Woods what to say.

As framed before the state courts, Petitioner's claim focuses on a single question Peasley asked Godoy during direct examination, as well as a series of questions Stuehringer proceeded to ask Godoy on cross-examination. Godoy testified after Stuehringer had already called Woods as a defense witness, wherein Woods had testified that, on September 8, 1992, he had told Godoy that McCrimmon, Minnitt, and an individual called "Chachi" were responsible for the El Grande murders. The next day, during Godoy's direct examination, Peasley asked the following question:

> Peasley: What I'm going to do is this: Ask you to focus on the time period of June 24th until the end of August of 1992. During that time period, had you developed any information up to the end of August, had you developed any information that would lead you to believe that either Christopher McCrimmon, Andre Minnitt, or Martin Fong were suspects in the killings of these three men at the El Grande Market?

> Godoy: No, sir.

This question was not directly followed by questions about Godoy's September 8, 1992 contact with Woods.

However, the next day, on cross-examination, Stuehringer asked Godoy about Keith Woods' September 8, 1992 statement:

Stuehringer:     So what you were saying to Mr. Woods and what Mr. Woods was saying to you was committed to a tape [on September 8, 1992]?

Godoy:           That's correct.

...

Stuehringer:     In the course of that statement is when you learn about Mr. McCrimmon and Mr. Minnitt?

Godoy:           Yes.

Stuehringer:     And this third person named Cha-Chi?

Godoy:           That's correct.

Stuehringer:     I think you testified earlier this afternoon that after September 8th, your next contact with Mr. Woods wasn't until November 20th?

Godoy:          That's correct.

Stuehringer:    So whatever information you
                had that you testified to
                between September 8th and
                November 20th came from
                that September 8th session?

Godoy:    Yes.

Petitioner argued before the state courts (as he argues here) that Godoy's testimony in response to the above questions constituted perjury and left the jury with the false impression that Woods was the original source of Godoy's suspicion of Fong.

As to the direct examination question by Peasley, the state PCR court ruled that Godoy's response did not meet the definition of perjury under Arizona law because of Fong's own representation in his petition that Godoy's answer was "technically [] true (although misleading)," considering Godoy stated in his September 9 and 15, 1992 investigative reports that he had obtained information by August 31, 1992 – *i.e.*, the end of August – implicating McCrimmon and Petitioner in the crimes. In other words, the state court ruled that a technically true statement, by definition, could not constitute perjury under Arizona law.

As to the alleged perjury committed by Godoy during Stuehringer's cross-examination of him, the state PCR court reasoned that Stuehringer's questions and Godoy's answers had to be considered in the entire context of Godoy's testimony. In particular, the state court found that when Godoy answered the above questions by Stuehringer, Godoy

did not actually state that he had never heard of the three defendants' names before meeting with Woods. Specifically regarding Fong, the state PCR court pointed out that earlier in Stuehringer's cross-examination of Godoy, Stuehringer had elicited testimony from Godoy that sometime in late June to late August, Godoy got in touch with members of the Gee family to obtain a list of current and former El Grande market employees and that Godoy found out from them that Petitioner was a former employee.

Most significant for the state court, on Peasley's redirect of Godoy, Peasley attempted to explore further the circumstances under which Godoy first spoke with the Gee family and how and from whom he first learned Petitioner was a possible suspect. Those questions began as follows:

> Peasley: When did that conversation with the Gee family actually take place?
>
> Godoy: I had spoken to them a couple of times throughout the summer about who worked there and specifically asked him right when Mr. Fong became a focus of this case – and the first week was September – about who actually worked there.
>
> Peasley: So when you talked to Mr. Gee and you asked him about his employment records, did you refer by name to the

individual you were concerned about whether or not he had worked there?

Godoy: Yes, I believe I at that time asked for Mr. Martin Soto.

Peasley: And had you gotten information, sir, before that conversation with Mr. Gee that provided you with the name, Martin Soto, so you would have a name to ask Mr. Gee about in the first place?

Godoy: Yes.

Peasley: And from how many different sources had you gotten the name, Martin or Martin Soto, prior to your conversation with Mr. Gee where you asked him about whether or not Martin Soto had ever worked there?

Stuehringer: Judge, objection, hearsay, foundation.

Peasley: The door was opened on that one, Judge. And, again, if I need to be heard, but Mr. Stuehringer made inquiry about that conversation.

Court:          Sustained.

Peasley:        Did you speak with Sergeant Zimmerling before your conversation with Mr. Gee where you asked about employment records? Did you speak with Sergeant Zimmerling of the Tucson Police Department?

Godoy:          Yes, I did.

Peasley:        Without going into the nature of the conversation that you had with Sergeant Zimmerling –

Stuehringer:    Judge, could I approach the bench and be heard?

Stuehringer and Peasley then engaged in a sidebar with the trial court judge in which Stuehringer asked that Peasley be precluded from exploring with Godoy in any fashion any anonymous sources of information possibly connecting Petitioner or a "Martin Soto" to the crime because such testimony lacked foundation and was prejudicial hearsay. The court, this time, overruled Stuehringer's objection, and Peasley proceeded as follows:

Peasley:        Sir, I was asking you about your conversation with Sergeant Zimmerling of the Tucson Police Department.

|  | When was it that you actually spoke with Sergeant Zimmerling? |
|---|---|
| Godoy: | The exact date I believe was August 31st. |

...

| Peasley: | Without going into the nature of the information, did Sergeant Zimmerling give you information that you thought was pertinent to this particular case? |
|---|---|
| Stuehringer: | Judge, may I just have a continuing objection? |
| Court: | Yes, you may. |
| Godoy: | Yes. |
| Peasley: | Was it after your conversation with Sergeant Zimmerling that you contacted the Gees and made inquiry about employment records? |
| Godoy: | Yes. |
| Peasley: | And was it after that conversation, sir, that you |

specifically asked about Martin Soto?

Godoy:     Yes, sir.

Peasley:   Were you at some point, then, after that inquiry provided with records concerning Martin Fong who you later came to know as Martin Soto?

Godoy:     Yes.

Based on the above testimony, the state court concluded that the jury actually was informed that Godoy suspected Petitioner's involvement in the El Grande murders prior to Godoy's September 8, 1992 meeting with Woods and at least as early as August 31, 1992, and that any limitations on the extent of the information presented to the jury about what Godoy knew prior to talking to Woods was caused, in part, by Petitioner's own counsel who kept objecting to Godoy testifying about information contained in his September 9 and 15, 1992 investigative reports.

The state PCR court likewise concluded that Godoy's quoted testimony on direct and cross-examination, in addition to not being perjurious, also did not give a material false impression to the jury that Godoy did not suspect Petitioner's involvement in the homicides until Godoy met with Woods. Stuehringer's admitted trial strategy was of particular import to the state PCR court in evaluating Petitioner's false impression argument.

Specifically, the state PCR court noted that Stuehringer's defense strategy in calling Woods as a defense witness was to try and connect the Chachi that Woods had referred to on September 8, 1992, to Martin Garza and to suggest that when Woods later stated to Detective Godoy on November 20, 1992, that, *inter alia*, Chachi was also referred to as "Martin" and was "Betty Christopher's boyfriend," those additional details connecting Chachi to Petitioner had been fed to Woods by Godoy. In other words, Petitioner's mistaken identity defense aimed to keep from the jury any inculpatory information – such as information in Godoy's September 9 and 15, 1992 investigative reports – identifying Petitioner as Chachi or a murder suspect prior to September 8, 1992, the date on which Woods first implicated a Chachi who seemingly could be connected to Martin Garza.

As a result, the state PCR court found that the prosecution could not be faulted for failing to elicit fully the very information that Petitioner affirmatively sought to keep out at trial. Moreover, the state PCR court noted that Fong, in apparent contradiction of his own argument, even acknowledged in his petition that Peasley attempted to elicit from Godoy at trial that Godoy had information implicating Fong in the crimes prior to September 8, 1992, and cited to Peasley's redirect of Godoy on October 20, 1993, quoted above, in which Peasley asked Godoy about information obtained from Sergeant Zimmerling and the Gee family. And the state PCR court again emphasized that the prosecution was nonetheless able to present the jury with some evidence, over defense counsel's repeated objections, that Petitioner became a suspect in the case on or about August 31, 1992, before Godoy spoke with Woods. Therefore, the state PCR court also rejected Petitioner's false impression argument.

Based on the above state PCR court reasoning and trial testimony at issue, Petitioner fails to show that the state PCR court's decision denying him relief on his *Napue* claim was unreasonable under 28 U.S.C. §§ 2254(d)(1) or (d)(2).

Petitioner first argues that Godoy's testimony on direct examination – that he developed no information suggesting that McCrimmon, Minnitt, and Petitioner were suspects in the El Grande murders during the time period from June 24 until the end of August 1992 – was in fact false because evidence shows that: 1) Godoy had suspected Petitioner and had been pursuing him all summer, and 2) Godoy had allegedly received certain information from Sergeant Zimmerling and an anonymous caller possibly implicating Petitioner and McCrimmon in the triple homicide as of August 31, 1992.

But neither of Petitioner's two factual allegations renders the state court's decision denying his *Napue* claim unreasonable because the evidence Petitioner claims reveals the deception in Godoy's direct examination testimony was in fact disclosed to the jury during trial, as acknowledged by the state PCR court. For example, Petitioner supports his first factual allegation – that Godoy had suspected Fong all summer – by citing to an August 27, 1992 investigative report authored by Godoy in which Godoy stated that he contacted the El Grande Market on June 30, 1992, to receive a list of former and current employees.

However, as the state PCR court noted, Godoy testified to substantially similar facts during Stuehringer's cross-examination of him wherein Godoy stated that he had contacted the Gees about obtaining a list of current and former employees somewhere in the time frame of late June to late August and thereafter learned that Petitioner was a

former employee. Moreover, during Stuehringer's recross of Godoy, Stuehringer expressly asked Godoy about the August 27, 1992 investigative report and Godoy's representation therein that he asked the Gees for an employee list on June 30, 1992. Considering such evidence was disclosed to the jury, Petitioner does not explain how these facts would otherwise render Godoy's direct-examination testimony false or misleading.[6]

---

[6] Petitioner also supports this first factual allegation – that Godoy suspected Petitioner all summer – by reference to an article from *The New Yorker* he used in support of an actual innocence claim raised in his second state PCR petition, filed in 2005. While this article was presented to the state PCR court, Petitioner appears not to have attempted to use this article in state court to support an allegation that the prosecution knowingly presented Godoy's false testimony at trial. For that reason, this Court may be precluded from considering such evidence in evaluating Petitioner's *Napue* claim. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

But, even if the Court could properly consider such evidence in evaluating Petitioner's *Napue* claim, the contents of that article do not support a conclusion that the state PCR court's finding regarding Godoy's direct testimony was unreasonable. In that article, Godoy is quoted as saying that he "decided to find all the people who had worked at the El Grande. It took weeks, but I found everyone except this one guy, this guy named Martin. . . . I was looking for him, but I was always one step behind. I needed to make him or clear him." However, this statement by Godoy is not tied to any express time frame and can be construed as consistent with Godoy's trial testimony that he sought a list of current and former market employees from the Gees as part of his general investigation of the crimes. That is, Godoy's representations in the article simply show that he generally sought to clear all market employees as suspects but does not suggest that he had any particular knowledge beyond Fong's status as a former employee that tended to show he might be involved in the El Grande murders prior to August 31, 1992. And it bears repeating that the jury nonetheless heard through Peasley's redirect examination of Godoy that Godoy obtained specific knowledge more

Petitioner's second factual allegation – that Godoy's direct testimony was false because undisclosed evidence shows that he actually obtained information implicating Fong from Sergeant Zimmerling and an anonymous caller by August 31, 1992 – is belied by the state court trial testimony quoted above. Here, again, the jury was presented with the evidence that Petitioner urges on appeal was not presented to the jury and rendered Godoy's testimony misleading. Indeed, as the state PCR court found, on redirect, the prosecution did in fact elicit that Godoy had learned via conversations with Zimmerling information implicating Petitioner in the case – the suspect name "Martin Soto" – by at least August 31, 1992, approximately one week before Godoy spoke with Woods. Moreover, the prosecution asked Godoy from what other sources he had obtained incriminating information about a "Martin" or "Martin Soto" at that time, but Petitioner's counsel made an objection to the admission of such testimony into evidence, which the court sustained. As a result, the prosecution was hampered in its ability to flesh out all information Godoy had that potentially implicated Petitioner prior to his meeting with Woods.

Petitioner nonetheless attempts to get around the fact that Godoy testified to obtaining certain incriminating facts from Zimmerling as of August 31, 1992, by contending that Godoy's testimony that he received the name "Martin Soto" from Zimmerling as of August 31, 1992, was also false. In support of this allegation, Petitioner notes that Godoy's September 9 and 15, 1992 investigative reports contain varied details about whether Zimmerling identified a "Chachi" as a possible suspect or a "Martin Soto" as a suspect. Petitioner

directly implicating Petitioner on or about August 31, 1992, approximately one week prior to his September 8, 1992 contact with Woods.

also notes that during pretrial interviews, both Zimmerling and Godoy stated that Zimmerling had identified as a possible suspect an individual named "Chachi" or "Martin" but had never used the last name "Soto."

But Petitioner's references to what very well may be inconsistencies between Godoy's trial testimony and other evidence detailing what Zimmerling told Godoy about possible suspect names on August 31, 1992, obfuscate the issue on appeal. Petitioner's *Napue* claim in state and federal court has always centered on whether Godoy's direct examination testimony was false and misleading because it allowed the jury to infer that Woods was the source of Godoy's suspicion of Fong. Even if Godoy's testimony about what information Zimmerling gave him was not fully accurate, Petitioner does not cogently dispute that Godoy's testimony on redirect at least communicated to the jury that Godoy's suspicion of Petitioner preceded his September 8, 1992 interview with Woods and instead arose from his prior contacts with Sergeant Zimmerling and the Gee family, thereby correcting any impression that Woods was the initial source of information linking Petitioner to the crime. In other words, Petitioner fails to develop the significance of possible inconsistencies concerning Godoy's trial testimony and statements about information received from Zimmerling for purposes of his *Napue* claim.

Petitioner also argues on appeal that the state court was unreasonable in concluding that Godoy's cross-examination testimony in which he testified that he "learned about" McCrimmon, Minnitt, and a "Chachi" from Woods during their September 8, 1992 conversation was not perjurious. However, as the state PCR court noted, when Godoy testified "yes" in response to a question phrased by defense counsel

asking if Godoy learned about Minnitt, McCrimmon, and a Chachi on that date, Godoy did not affirmatively state that he learned the names of those three individuals for the first time during that conversation.

Moreover, as the state argues on appeal, it is reasonable to construe the phrase "learn about" in the context of the question posed by defense counsel to refer to the *role* played by a Chachi in the murders, rather than simply the *name* Chachi. Petitioner does not dispute that Godoy first learned about the details of a Chachi's alleged role in the El Grande murders from his conversation with Woods on September 8, 1992, though Godoy had otherwise obtained the name "Chachi" as a possible suspect by at least August 31, 1992, as reflected in his September 9 and 15, 1992 investigative reports.

Godoy's affirmative one-word answer to a question phrased by defense counsel in this case also directly contrasts with Godoy's testimony in the trials of Petitioner's co-defendants, where Woods was the key state witness and the prosecution expressly asserted in its opening statement that Godoy did not have the names of McCrimmon, Minnitt, or Petitioner until *after* he met with Woods on September 8, 1992. *Minnitt*, 55 P.3d at 778–79. Here, because Woods was a defense witness, the prosecution did not even mention Woods in its opening statement. Moreover, in those later trials, Peasley asked Godoy when McCrimmon, Minnitt, and Fong became suspects and Godoy expressly responded that he did not suspect any of the named defendants until he met with Woods on September 8, 1992, and that he did not suspect a former employee in the El Grande homicides and did not get in contact with the Gee family about a former employee until after he spoke with Woods on that date. *Id*.;

*see also In Re Peasley*, 90 P.3d at 767–68.  Godoy's isolated
"learn about" answer in the context of Petitioner's trial does
not approach this same level of affirmative misrepresentation.

Even if Godoy's direct and cross-examination testimony
was not outright perjurious, Petitioner nonetheless urges that
Godoy's quoted testimony still created a material false
impression that Woods was the source of the name *Chachi* –
if not the source of Godoy's general suspicion of Fong –
because the prosecution's redirect examination of Godoy only
focused on whether Godoy had suspected a former market
employee,[7] a "Martin," or a "Martin Soto" on or about

---

[7] Petitioner recognizes that the damaging aspect of Woods' September
8, 1992 statement that links Chachi to him as opposed to Martin Garza is
the reference to Chachi being a former market employee.  As a result, he
at times appears to argue on appeal that Godoy's at-issue testimony was
also misleading because Godoy's answers in conjunction with Woods'
trial testimony made it appear as if Woods was the source of Godoy's
suspicion of Petitioner as a former market employee, and thereby deprived
Petitioner of a meaningful opportunity to argue that Godoy fed that piece
of information to Woods.

To the extent he means to make such an argument, the Court finds it
to be without merit.  To begin, Petitioner did not so precisely argue in
front of the state PCR court that Godoy's direct and cross-examination
testimony in Petitioner's trial was false because it left an impression that
Woods was the source of Godoy's suspicion of a former employee.
Instead, his arguments pressed in state court focused on whether Godoy's
testimony gave the impression that Woods was the source of Godoy's
suspicion of Fong generally.

But, turning to the merits of this more focused claim, Peasley's
questions on redirect examination, admittedly did not expressly elicit a
date by which the Gees identified Petitioner to Godoy as a former market
employee, though a specific date was provided regarding Godoy's contact
with Sergeant Zimmerling.  But, Peasley's questions and Godoy's answers
support a reasonable conclusion under the AEDPA's deferential review of

August 31, 1992. In other words, Petitioner argues that the state PCR court's reliance on Peasley's redirect of Godoy as mitigating any misunderstanding about when Petitioner generally became a suspect in the case was unreasonable because the state court failed to acknowledge the more nuanced point that the jury remained uninformed that Godoy already suspected a Chachi of the crime and had information linking Petitioner to the name "Chachi" prior to his September 8, 1992 contact with Woods.

---

the state PCR court's fact-finding that Peasley conveyed to the jury that Godoy obtained information from the Gees that Petitioner was a former market employee prior to Godoy's September 8, 1992 contact with Woods; the order of Peasley's questions suggested that Godoy got in contact with the Gees shortly after learning from Zimmerling incriminating information about a Martin or Martin Soto on August 31, 1992, more than a week before Godoy first met with Woods. Moreover, as noted by the state PCR court, the jury heard during Godoy's cross-examination by Stuehringer that Godoy's contact with the Gees occurred around late August. The jury also heard Godoy state on redirect examination that he immediately contacted the Gees when Petitioner became a focus of the case as of September.

Peasley's questions and Godoy's answers also made clear that Godoy was prompted to contact the Gees about a suspected former employee because of his August 31, 1992 contact with Sergeant Zimmerling, not because of his later contact with Woods. This testimony directly contrasts with Godoy's false testimony and Peasley's improper arguments during the trials of Petitioner's co-defendants that Woods' September 8th statement caused Godoy to contact the Gees about a former employee. In other words, Peasley's redirect questions in Petitioner's criminal case made clear that Woods was not the initial source of Godoy's suspicion of Petitioner as a former market employee. Because the jury was informed that Godoy was suspicious of a former employee (namely, Petitioner) before Godoy met with Woods, the defense was not deprived of an opportunity to argue to the jury that Godoy fed that detail to Woods during their September 8, 1992 meeting.

However, this distinction between a general suspicion of Petitioner and suspicion of a Chachi was not lost on the state PCR court. Instead, as the state PCR court repeatedly emphasized in its decision denying Petitioner relief, Petitioner's counsel consistently objected when Peasley began asking Godoy about the contents of his September 9 and 15, 1992 investigative reports. While it remains unclear if the prosecutor meant to at some point ask Godoy about a Chachi as referred to in those reports, the state PCR court's focus on such defense objections at least acknowledges that the prosecutor was hampered in his ability to reveal fully to the jury the contents of the September 9 and 15, 1992 investigative reports, which contained information linking Petitioner to the name Chachi.

But, more significantly, the state PCR court's focus on Petitioner's defense theory in rejecting his false impression claim demonstrates that it reasonably concluded that the original source of the name Chachi was not material to Petitioner's defense. In other words, Petitioner's defense theory did not aim to prove that Godoy fed the name Chachi to Woods during their September 8, 1992 meeting, in comparison to the defense theories of Petitioner's co-defendants who were explicitly named by Woods in his September 8, 1992 statement and wanted to prove that Godoy fed their names to Woods on that date. *Minnitt*, 55 P.3d at 778.

While Stuehringer no doubt at times pointed out that it was suspect for Godoy to engage in untaped communications with Woods on September 8, 1992, Stuehringer actually wanted the jury to believe Woods' September 8, 1992 representation that a Chachi – Martin Garza – had committed the El Grande murders with McCrimmon and Minnitt as part

of Petitioner's mistaken identity defense. As a result, Stuehringer purposefully did not present the jury with any argument that Godoy was motivated to feed the name "Chachi" to Woods on that date. Indeed, when testifying about his defense strategy during two different state PCR court evidentiary hearings, Stuehringer expressly stated that he aimed to have the jury believe Woods' September 8, 1992 representation that a Chachi committed the crimes.

Stuehringer's opening statement comports with his articulation of the defense strategy made during the state PCR court evidentiary hearings. As reflected in that opening statement, Petitioner's mistaken identity defense focused on Godoy feeding Woods additional information connecting Chachi to Petitioner *after* Godoy met with Woods on September 8, 1992, information – that McCrimmon and Minnitt referred to Chachi as "Martin" and "Betty Christopher's boyfriend" and that Woods could now identify Petitioner as Chachi – which Woods only included in his later November 20, 1992 statement. For example, during opening statement, Stuehringer began by presenting to the jury as worthy of belief Woods' initial September 8, 1992 statement to Godoy. In particular, he highlighted that on that date Woods told Godoy that he had never met Chachi, did not know who he was, and understood Chachi to have been masked during the triple homicide. Stuehringer also omitted that Woods referred to Chachi as a market employee on that date, the primary fact in Woods' September 8, 1992 statement undermining Petitioner's mistaken identity defense. Stuehringer went on to tell the jury that after September 8, 1992, Detective Godoy affirmatively misrepresented under oath during a juvenile court transfer hearing that Woods told him that: Petitioner had also confessed to the crime;

Petitioner was in possession of the murder weapon; and Chachi was Petitioner.

Because Godoy had gone "out on a limb" when testifying in juvenile court, Stuehringer told the jury that Godoy had a clear motive to feed Woods additional information that more explicitly connected Chachi to Petitioner when Godoy and Woods met again on November 20, 1992. Stuehringer informed the jury that it would have to decide how "credible" Keith Woods' "second version" of events as reflected in his November 20, 1992 statement was when compared to his initial September 8, 1992 statement. In other words, Stuehringer attempted to characterize Woods' two primary statements to Godoy as distinct and irreconcilable, rather than cohesive iterations of a single story about McCrimmon and Minnitt's joint confession to Woods on the day he was released from prison. Stuehringer then argued to the jury that the real Chachi in this case would prove to be Martin Garza.

Indeed, defense counsel's decision to call Woods as a witness at all – when he otherwise would not have testified on behalf of the state – was based on this defense theory that Woods' September 8, 1992 statement was exculpatory as to Petitioner because that statement did not expressly name or directly identify Petitioner as a perpetrator and provided an opportunity to argue that Martin Garza, McCrimmon's close friend who was undisputedly nicknamed Chachi, actually committed the crimes with McCrimmon and Minnitt. For that reason, Stuehringer (unsuccessfully) moved in limine to preclude the admission of Woods' November 20, 1992 statement, which Stuehringer asserted raised confrontation clause problems because it included the alleged confessions of Fong's co-defendants in a manner that more directly implicated Petitioner, but simultaneously sought to have

Woods' September 8, 1992 statement admitted in support of Petitioner's mistaken identity defense.

Defense counsel's decision to utilize Woods' September 8, 1992 statement to pursue a mistaken identity defense may have been imperfect, considering that statement also included reference to Chachi being a market employee when Martin Garza undisputedly had never worked at the El Grande Market. But, imperfections in the defense theory[8] do not otherwise render the original source of the name Chachi material to Petitioner's innocence claim under *Napue*.

Instead, as the state PCR court realized, any testimony from Godoy that he obtained the name "Chachi" prior to his meeting with Woods on September 8, 1992, would have undermined rather than benefitted Petitioner's mistaken identity defense because that defense required Stuehringer to minimize any connections between Petitioner and a so-called Chachi. Godoy's investigative reports,[9] which showed that he had the name "Chachi" prior to meeting with Woods on September 8, 1992, also problematically linked the name "Chachi" to "Martin Soto" and "Martin Fong." Because of those connections, Stuehringer testified during the state PCR court evidentiary hearings that he sought to prevent Godoy from testifying to any of this information, resulting in Stuehringer's objections when Peasley began to question

---

[8] The Court addresses below the merits of Petitioner's ineffective assistance of counsel claim based on Stuehringer's decision to call Woods as a defense witness.

[9] The Court addresses Fong's *Brady* claim premised on the alleged non-disclosure of Godoy's September 9, 1992 investigative report in the concurrently filed memorandum disposition. The state undisputedly disclosed Godoy's September 15, 1992 investigative report to Petitioner.

Godoy about information obtained from Sergeant Zimmerling and other sources. In contrast to Godoy's investigative reports, Keith Woods' initial statement to Godoy on September 8, 1992, did not so directly tie Chachi to Petitioner. Indeed, Woods' initial statement referred to Chachi wearing a mask, undermining the state theory that Chachi knew the store employees as a former employee himself and exploited their recognition of him to enter the store. Further, Woods testified that McCrimmon told him that Chachi lived on the street where Martin Garza lived. Based on these statements by Woods, the state PCR court reasonably concluded that Petitioner's mistaken identity defense was bolstered by having the jury believe Woods' September 8, 1992 statement that McCrimmon and Minnitt had confessed to committing the crime with a masked Chachi.

Petitioner's characterization of his trial defense theory during his postconviction proceedings and before this Court is somewhat revisionist because he now claims that his defense theory was premised on Godoy feeding Woods the name Chachi during their September 8, 1992 meeting and fabricating that a Chachi was ever involved in the murders, making his defense theory more like that of his co-defendants. Understandably, Petitioner wants to draw parallels to the trials of his co-defendants because Godoy and Peasley were found to have committed misconduct in those cases.

But his recharacterization not only contradicts the trial transcripts in this matter and Stuehringer's articulation of the defense strategy during the state PCR evidentiary hearings, but it also fails to account for the key difference in Petitioner's case as compared to the prosecutions of his co-defendants. Again, the state undisputedly was not going to

call Woods as a witness or present his September 8, 1992 and November 20, 1992 statements as evidence during Petitioner's prosecution. Unlike his co-defendants, Petitioner never would have had to neutralize or otherwise attack Woods' September 8, 1992 statement in order to establish his innocence at trial. If Petitioner did not want the jury to hear and believe that Woods had been told by McCrimmon and Minnitt that they committed the crimes with a Chachi, Petitioner had the option of not calling Woods as a witness and introducing a suspected Chachi into the proceedings. Petitioner offers no plausible explanation for why he would have chosen to call Woods as a defense witness if he only meant to demonstrate that Woods' September 8, 1992 statement was false in its entirety and that Godoy fed Woods all of the information about a Chachi on that date.

As a result, the state PCR court was reasonable in concluding that neither Godoy's direct nor cross-examination testimony gave a *material* false impression of the evidence in light of the mistaken identity defense that Petitioner advanced at trial, which hinged on the jury believing Woods' initial account that a masked individual nicknamed Chachi, *i.e.*, Martin Garza, had committed the crimes with Minnitt and McCrimmon.[10] This Court's conclusion

---

[10] The substance of Petitioner's *Napue* argument focuses on whether Godoy's testimony was false or misleading because it gave an impression that Woods was the initial source of Godoy's suspicion of Petitioner specifically, hence Petitioner's focus on what information Godoy had implicating Petitioner prior to September 8, 1992, and whether Peasley's redirect of Godoy sufficiently revealed that Godoy had information implicating Petitioner in the crimes prior to Godoy's first meeting with Woods.

But Petitioner also at times generally states that Godoy's testimony was false and misleading because it gave the impression that Woods was the initial source of Godoy's suspicion of Petitioner, *Minnitt*, and *McCrimmon*, collectively. To the extent Petitioner is arguing that Godoy's testimony was also materially false and misleading in Petitioner's case because it failed to communicate that Godoy likewise suspected Minnitt and McCrimmon prior to meeting Woods on September 8, 1992, the Court rejects this argument.

Again, as the state PCR court found, Godoy never affirmatively testified that he did not have the names of these three individuals prior to his meeting with Woods, in contrast to his testimony during Minnitt's and McCrimmon's trials. The undisputed factual record also shows that Godoy's September 8, 1992 contact with Woods was the first date on which Godoy spoke with someone who communicated specific details about McCrimmon's, Minnitt's, and Chachi's alleged roles in the El Grande murders.

But, more significantly, the initial source of Godoy's suspicion of Minnitt and McCrimmon was not material to Petitioner's defense in the same way that the initial source of the name Chachi was not material to Petitioner's defense. As part of his mistaken identity defense, Petitioner wanted the jury to believe that Minnitt and McCrimmon had committed the El Grande murders with Martin Garza. As a result, Petitioner was not motivated to ensure that the jury understood that Godoy had those two suspect names prior to his meeting with Woods because Petitioner never intended to argue that Godoy fed those names to Woods or that McCrimmon and Minnitt were innocent. Instead, Petitioner wanted the jury to believe those portions of Woods' September 8, 1992 statement that implicated Minnitt and McCrimmon, as well as those portions that implicated a masked Chachi. *See*, *e.g*., Dist. Ct. Docket No. 144-3, Exh. W at 49 (Stuehringer's testimony at state PCR evidentiary hearing that he wanted the jury to "believe somebody by the name of ChaChi with a mask came into the store, *together with McCrimmon and Minnitt*, and perpetrated the killings.") (emphasis added).

In light of Petitioner's defense at trial and because Godoy never affirmatively testified that he did not have Minnitt's and McCrimmon's names before his contact with Woods, the prosecutor likewise would have

does not mean to suggest that a criminal defendant's chosen defense theory can nullify what might otherwise be a false impression of the evidence caused by a state witness and left uncorrected by the prosecution. As Petitioner correctly points out, the state has a constitutional duty to correct false testimony given by its witnesses, even when the defense knows the testimony was false but does nothing to point out such falsity to the jury or judge. *See*, *e.g.*, *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("[T]he government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony was false.").

However, on the facts of this case and under the AEDPA's deferential review, Petitioner fails to show that the state PCR court's rejection of his *Napue* claim involved an unreasonable application of controlling federal law.[11] Again,

---

had no obligation to clarify further to the jury that McCrimmon and Minnitt were already suspects when Godoy spoke with Woods on September 8, 1992.

[11] For the first time in his reply brief, Petitioner argues that the state PCR court's false impression analysis was not just unreasonable under *Alcorta* but that it was also contrary to *Alcorta* and *Napue*. While the state PCR court correctly recited federal law under *Alcorta*, it admittedly went on to discuss *State v. Orantez*, 902 P.2d 824 (Ariz. 1995), at some length when addressing Petitioner's false impression argument. As Petitioner points out, the state PCR court's discussion of *Orantez* appears inconsistent with federal law by suggesting that the onus is on defense counsel to expose false or misleading testimony. As this Court has stated, "It is 'irrelevant' whether the defense knew about the false testimony and failed to object or cross-examine the witness, because defendants 'c[an]not waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and

Godoy never affirmatively testified that he first obtained the name "Chachi" from Woods. But even putting that fact aside, the original source of that nickname was not independently significant to or probative of Petitioner's guilt or innocence outside the context of Petitioner's defense strategy. And, in light of the testimonial evidence presented at trial, Petitioner also has not shown that the state PCR court engaged in an unreasonable determination of the facts when it concluded that the jury had otherwise been apprised that Godoy suspected Petitioner, if not a Chachi, prior to Godoy's September 8, 1992 contact with Woods. The record reflects that the prosecution presented the jury with evidence that Godoy began to suspect Petitioner after he spoke with Sergeant Zimmerling on August 31, 1992, and shortly thereafter learned from the Gees that Petitioner was a former

---

the criminal justice system.'" *Sivak v. Hardison*, 658 F.3d 898, 909 (9th Cir. 2011) (alternation in original) (citation omitted); *LaPage*, 231 F.3d at 492.

But, despite the state PCR court's misplaced citation to *Orantez*, it nonetheless properly relayed federal law under *Alcorta*, and its denial of Petitioner's false impression claim, as discussed above, still squares with a reasonable interpretation of *Alcorta* and *Napue*. In other words, the state PCR court did not deny Petitioner's false impression claim simply because Stuehringer could have but failed to object to Godoy's purportedly misleading testimony while the prosecutor idly sat by. Instead, it noted that the prosecution, after defense counsel elicited some of the purportedly problematic testimony, actually tried to and did get information to the jury that Godoy suspected Petitioner before Godoy first met with Woods. The state court also recognized that defense counsel affirmatively aimed to preclude trial testimony identifying Petitioner as Chachi or a murder suspect prior to September 8, 1992, because, in defense counsel's opinion, those facts undermined the mistaken identity defense. Again, the state court's decision reasonably recognized that the materiality of the source of the name "Chachi" could not be considered in a vacuum, but had to be evaluated in the context of Petitioner's defense at trial.

market employee, prior to Godoy's September 8, 1992 contact with Woods. As a result, Godoy's testimony did not create a material false impression that Woods was the initial source of Godoy's suspicion of Fong or a former market employee.

Before the state PCR court, Petitioner also cited two statements Peasley made in closing argument at trial to support his position that the prosecutor, Peasley, went on to argue Godoy's allegedly false testimony to the jury. Having found Godoy's testimony not to be false or materially misleading, the state PCR court did not proceed to address expressly Peasley's closing remarks. However, because Petitioner recites those remarks on appeal, we here conclude that Peasley's comments in closing also do not render the state court's decision denying his *Napu*e claim unreasonable.

First, Peasley repeated in closing argument that the Tucson police did not suspect Petitioner or his co-defendants from June 24, 1992, until late August 1992, and stated directly after that that "[t]he first time that Detective Godoy is able to sit down and talk with anybody who gives him direct information about what happened is that contact on September 8th with Keith Woods." But again, this remark does not state affirmatively that Godoy failed to suspect Petitioner as a former market employee until he spoke with Woods. This comment also has to be considered in the context of the evidence that the state PCR court reasonably found to have been presented to the jury, *i.e.*, that the jury was informed that Petitioner became a suspect on or about August 31, 1992, due in large part to Peasley's redirect examination of Godoy. And again, Petitioner does not dispute that the first individual to provide Godoy with details

about a Chachi's alleged role in the El Grande murders was Woods.

Second, Petitioner cites Peasley's statement in closing that Keith Woods told Godoy that "Martin" was "a guy who used to work there, the boyfriend of Betty Christopher" and that Godoy got this information from Woods "beginning on September 8th, up through basically November 20th when he talks to the detective again. . . ." However, this statement primarily summarizes the content of Woods' trial testimony and memorialized statements. Such a summary does not suggest Godoy failed to suspect Petitioner until he spoke with Woods. By this closing remark, Peasley also neither explicitly nor implicitly claimed to be summarizing all the evidence in the case implicating Petitioner in the triple homicide, such that the jury might infer from Peasley's comment that Woods' September 8, 1992 statement to Godoy was the first piece of evidence obtained by the state tending to show that Petitioner might have been involved in the triple homicide.

The remaining arguments Petitioner presses on appeal related to his *Napue* claim likewise do not entitle him to any relief. For example, he argues that the state PCR court was unreasonable in hinging its decision on the fact that Godoy had not admitted to committing perjury during Petitioner's trial. However, Petitioner mischaracterizes the state's decision. Instead, the state PCR court noted that *Petitioner* had claimed that Godoy admitted to perjuring himself in *State v. Soto-Fong*, but Petitioner provided no evidence showing that Godoy had made such admissions. The state PCR court still went on to undertake its own analysis of whether Godoy perjured himself, as discussed at length above, and reasonably

concluded that he had not provided false testimony during Petitioner's trial.

Petitioner also argues that the state court was unreasonable because it hinged its decision on the fact that no judicial or administrative decision found Godoy to have perjured himself in *State v. Soto-Fong*. Here again, Petitioner misinterprets the state PCR court's decision. The state court only made that point because Petitioner asserted that Godoy had admitted to committing perjury in Petitioner's trial. The state court still independently analyzed the merits of Petitioner's perjury and false impression arguments and did not deny them solely because no other court had ruled on them.

Petitioner also has not shown that the state PCR court's decision is unreasonable because the Arizona Supreme Court has since found that Godoy and Peasley engaged in misconduct during the later trials of his co-defendants. As addressed previously, the testimony Godoy gave and the arguments Peasley made during Petitioner's trial are materially distinguishable from Godoy's and Peasley's conduct during the trials of Petitioner's co-defendants. Again, in those later trials, Peasley represented and Godoy affirmatively testified that the police had not obtained the names of McCrimmon, Minnitt, or Petitioner as possible suspects in the triple homicide until Godoy spoke with Woods on September 8, 1992. They also represented that Godoy did not suspect a former employee in the murders and did not contact the Gee family about a former employee until Godoy spoke with Woods. *Minnitt*, 55 P.3d at 778; *In Re Peasley*, 90 P.3d at 767–68. As evaluated in detail above, the trial record in Petitioner's case shows that these same misrepresentations were not made to the jury during

Petitioner's trial. And the partial transcripts Petitioner supplies of Godoy's and Peasley's testimony given during hearings related to their misconduct in the later trials of Petitioner's co-defendants do not undermine such a conclusion, contrary to Petitioner's suggestion. The cited transcripts do not demonstrate that Peasley and Godoy admitted to misconduct in Petitioner's trial, as asserted by Petitioner, but instead show how Godoy's testimony and Peasley's arguments morphed from accurate information in Petitioner's trial to affirmative misrepresentations during the trials of his co-defendants.[12, 13]

---

[12] Petitioner also argues that the state PCR court's rejection of his *Napue* claim was unreasonable because Woods has now admitted, as reflected in a 2005 affidavit, that Godoy and Peasley fed him information and told him what to say during Petitioner's trial. By making this argument, Petitioner attempts to incorporate his uncertified claim that the state fabricated Woods' trial testimony into this distinct, though related, certified issue respecting Godoy's trial testimony. However, the Court separately addresses and rejects Petitioner's testimonial fabrication claim in the concurrently filed memorandum disposition and will not repeat its reasoning here. The Court also separately addresses and rejects in the concurrently filed memorandum disposition Petitioner's claim that Peasley improperly vouched for Godoy during closing argument, though Petitioner likewise refers to Peasley's alleged improper vouching when arguing this certified *Napue* claim.

[13] Petitioner contends that the district court erred in denying him an evidentiary hearing on his *Napue* claim under *Pinholster*, 131 S. Ct. at 1398 (holding that reasonableness review under the AEDPA is limited to the record before the state PCR court that adjudicated the claim on the merits), because he has otherwise shown that the state court's merits decision was unreasonable under 28 U.S.C. §§ 2254(d)(1) and (d)(2). Because we reject his reasonableness challenges to the state PCR court's legal analysis and fact-finding, we affirm the district court's denial of an evidentiary hearing on whether the prosecution knowingly presented false testimony to the jury through Detective Godoy. Notwithstanding *Pinholster*'s limitations on evidentiary development in federal court,

In denying Petitioner relief on his prosecutorial misconduct claim, the Court sympathizes with Petitioner's understandable concern that the same egregious misconduct perpetrated by Peasley and Godoy during the prosecutions of Petitioner's co-defendants must have infected his earlier trial. However, in light of the deference owed state court decisions under the AEDPA and upon a thorough consideration of the trial record in Petitioner's case, the Court cannot conclude that the state PCR court's decision denying Petitioner relief on this claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87

### B. Alleged Ineffective Assistance of Counsel

Fong's ineffective assistance of counsel claim is governed by the two-part standard articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this clearly established federal law, "a [petitioner] must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). In evaluating whether an attorney's performance was deficient, "courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and make every effort 'to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1149 (9th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689). To establish prejudice, Petitioner "must show that there is a reasonable probability

---

Petitioner provides no further persuasive explanation for why he should be entitled to evidentiary development in federal court on this claim.

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Moreover, under the AEDPA, this Court asks "not 'whether counsel's actions were reasonable' but 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Hibbler*, 693 F.3d at 1150 (quoting *Richter*, 131 S. Ct. at 788). In other words, "a 'doubly deferential review' applies to *Strickland* claims rejected by the state court." *Id.* (quoting *Mirzayance*, 556 U.S. at 123); *see also Richter*, 131 S. Ct. at 786 ("It bears repeating that even a strong case for relief [under *Strickland*] does not mean the state court's contrary conclusion was unreasonable."); *id.* at 786–87.

Petitioner argues that his defense attorney violated well-established professional norms by calling the state's informant, Keith Woods, as a defense witness to pursue a tenuous mistaken identity defense when the prosecution undisputedly did not plan to have Woods testify during its case-in-chief because of concerns under *Bruton*. He contends that Woods' testimony was prejudicial under *Strickland* because it allowed for the admission of McCrimmon's and Minnitt's alleged confessions to committing the El Grande murders with a Chachi, an individual whose identity was also linked to Petitioner by Woods' testimony. Fong asserts that the state PCR court's rejection of his ineffective assistance of counsel claim constitutes both an unreasonable determination of the facts and an unreasonable application of *Strickland*.[14]

---

[14] Though Petitioner also refers to the state PCR court's denial of his claim as "contrary to" federal law in a heading, he fails to develop such

The relevant portion of the last reasoned state court decision denying Petitioner relief on this claim bears repeating in full:

> Defense counsel's reasoned trial strategy was to use Keith Woods' original statement of September 9, 1992 [sic][15] to implicate the person referred to as "Cha-Chi" and direct the jury's attention to this person and away from the defendant and particularly away from the fingerprint evidence implicating the defendant. This was a particularly plausible theory as the Petitioner/defendant's attorney not only provided evidence of a plausible identity for this third person in Martin Garza who has the nickname ChaChi and was a friend of one of the co-defendants and lived in a referenced neighborhood. This was a critical part of the defense strategy. The "Cha-Chi" described by Keith Woods wore a mask. The state claimed the defendant was able to gain after-hours access to the market because he was known by Mr. Gee. The two points are not reconcilable. If the perpetrator needed to reveal himself to gain access he would not wear a mask. The use of a mask implies "Cha-Chi" was not Martin Soto-Fong, from which the jury may infer Martin Soto-Fong was not a participant in the crimes.

---

an argument. And the state court correctly recited *Strickland*'s standard when denying all of Petitioner's ineffective assistance of counsel claims.

[15] The date should undisputedly read September 8, 1992.

Keith Woods was critical to the defense's theory of the case. This was a calculated and reasoned trial strategy by an experienced criminal defense attorney.[16]

Consistent with the state PCR court's articulation of the defense theory, Stuehringer provided testimony at two different state PCR evidentiary hearings in which he represented that he chose to call Keith Woods in order to diffuse the fingerprint evidence implicating Petitioner and to create reasonable doubt about the identity of the third perpetrator who committed the crimes with McCrimmon and Minnitt based on Woods' September 8, 1992 identification of a masked Chachi. In particular, Stuehringer testified that Woods' identification of a masked Chachi as a perpetrator allowed him to undermine the state theory that Petitioner exploited the store employees' recognition of him to gain entry into the market and also allowed him to point the finger at Martin Garza, McCrimmon's friend who, unlike Petitioner, undisputedly went by the nickname Chachi. In addition, Stuehringer claimed to have discussed with Petitioner

---

[16] On direct review, the Arizona Supreme Court also made note of Stuehringer's "tactical" decision to call Woods, stating the following:

Nor will we second-guess trial counsel's tactical decision to introduce evidence that the murderer was Cha-Chi, even at the expense of opening the door to Woods' later statements. Fingerprint evidence and other testimony connected defendant to the crime. It is understandable that defense counsel would want to raise the issue of whether Cha-Chi, a person other than Fong, committed the murders, even at the expense of other evidence indicating that "Cha-Chi" was Fong.

*Soto-Fong*, 928 P.2d at 618.

whether to call Woods as a witness and testified that he sought guidance from other peer attorneys about whether to utilize Woods for a mistaken identity defense.

On appeal, Petitioner urges that the state PCR court was unreasonable in treating as a "calculated and reasoned trial strategy" Stuehringer's decision to call Woods as a witness and utilize his September 8, 1992 statement in pursuit of a mistaken identify defense for a number of reasons. In particular, he points out that: 1) Woods' September 8, 1992 statement already referred to Chachi as a market employee – a fact implicating Petitioner rather than Martin Garza; 2) Stuehringer also had learned in a pretrial March 4, 1993 interview of Woods that he was not certain and had only assumed Chachi wore a mask during the homicides despite his comment to that effect in his September 8, 1992 statement; 3) Stuehringer was on notice that Woods' later November 20, 1992 statement, with additional information linking Petitioner to Chachi, would no doubt be introduced at trial after the trial court denied Stuehringer's motion in limine to preclude the introduction of that statement; and 4) Stuehringer could have introduced the name "Chachi" through Godoy's testimony without calling Woods as a witness in order to pursue a mistaken identity defense. Petitioner also asserts that Stuehringer did not act reasonably by ignoring significant forensic evidence – Petitioner's fingerprints at the scene – in order to pursue a tenuous mistaken identity defense.

None of Petitioner's arguments demonstrates that the state PCR court engaged in an unreasonable application of *Strickland* or made an unreasonable determination of the facts in denying his ineffective assistance of counsel claim. *Richter*, 131 S. Ct. at 786–87 (state court ruling must be "so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). First, Petitioner correctly points out that Woods' September 8, 1992 statement did refer to Chachi being an El Grande Market employee, undermining the argument that Martin Garza, who undisputedly never worked at the market, was the Chachi who had committed the murders. However, as the state PCR court emphasized, Woods' September 8, 1992 statement also referred to Chachi being "masked down or whatever" when he committed the crimes. As the state PCR court recognized and as Stuehringer testified during the state PCR evidentiary hearing, Chachi's use of a mask to hide his face during the robbery was inconsistent with the state's theory of the case that Petitioner exploited the store employees' recognition of him as a former employee to gain entrance to the El Grande Market, thus casting doubt on whether Chachi was in fact Petitioner or a former employee.

Moreover, Stuehringer had obtained from Woods during a March 4, 1993 pretrial interview his statement that McCrimmon told him that Chachi lived behind a Circle K off of a street called Prince – Martin Garza's approximate address at the time of the El Grande homicides and what the state PCR court referred to as the "referenced neighborhood." The state court was reasonable in concluding that this address, along with the reference to Chachi being masked, provided Stuehringer with a significant opportunity to point the finger at Martin Garza – an undisputed friend of McCrimmon's who, unlike Petitioner as argued by the defense, went by the nickname Chachi – and to undermine indirectly and implicitly Woods' representation on September 8, 1992, that Chachi also was a former market employee.

Petitioner also accurately points out that, after making his September 8, 1992 statement, Woods equivocated on whether Chachi wore a mask. During a March 4, 1993 pretrial interview, Woods told Stuehringer that he just assumed that Chachi wore a mask and was not told that by McCrimmon or Minnitt. Because of this equivocation, Petitioner argues that Stuehringer and the state PCR court placed too much emphasis on Woods' initial September 8, 1992 statement that Chachi was masked when justifying Stuehringer's decision to use Woods' testimony at trial in support of a mistaken identity defense.

Stuehringer nonetheless was able to elicit the following testimony from Woods during trial:

> Stuehringer: Do you recall telling Detective Godoy that McCrimmon and Minnitt told you Chachi had on a mask when he went into the market?
>
> Woods: Yeah.
>
> Stuehringer: Thank you, sir. Now, you did your best that day to be truthful with Detective Godoy?
>
> Woods: Yes.

On cross-examination, Peasley admittedly went on to elicit from Woods that he said Chachi was "masked down or whatever" because he assumed Chachi was wearing a mask but was not sure of that fact. But, on redirect examination,

Stuehringer elicited from Woods that he never told Godoy that his comment that Chachi was "masked down or whatever" was just an assumption and not information directly obtained from McCrimmon and Minnitt.

Based on this trial testimony, Petitioner has not shown that the state PCR court engaged in unreasonable fact-finding in concluding that Woods described Chachi as wearing a mask. *See McClure v. Thompson*, 323 F.3d 1233, 1243–44 (9th Cir. 2003) (holding that state court findings of fact are entitled to deference even though evidence may cast doubt on findings such that federal court would have made different findings of fact). Woods indeed made such a statement on September 8, 1992, even if he later equivocated on that point. And Stuehringer attempted to undermine Woods' equivocation on redirect examination by pointing out that Woods never told Godoy that he was not sure if Chachi actually wore a mask. Moreover, even if Woods later equivocated about whether Chachi wore a mask, that Woods *ever* referred to Chachi as masked still provided Stuehringer with an opportunity to cast doubt on the state's theory of the case that Petitioner was Chachi and exploited the store employees' recognition of him as a former employee to enter the El Grande Market, especially considering Stuehringer presented additional evidence that Petitioner was not known by the nickname "Chachi" and that Martin Garza had such a nickname, lived on a referenced street identified by Woods, and was close friends with McCrimmon. *Richter*, 131 S. Ct. at 786 ("It bears repeating that even a strong case for relief [under *Strickland*] does not mean the state court's contrary conclusion was unreasonable.").

Petitioner also urges that the state PCR court was unreasonable in condoning Stuehringer's decision to call

Woods as a defense witness after Stuehringer lost a motion in limine seeking to prevent Woods from testifying to the contents of his November 20, 1992 statement which included additional details linking Chachi to Petitioner. But the state PCR court concluded that, "Keith Woods was critical to the defense's theory of the case." That conclusion implies that the state PCR court found reasonable Stuehringer's determination that the benefits of calling Woods to testify outweighed the negatives associated with the introduction of his November 20, 1992 statement. *See*, *e.g.*, *Brown v. Ornoski*, 503 F.3d 1006, 1013 (9th Cir. 2007) ("Although [defense counsel's] decision to put [a witness] on the stand came with some risks, it came with benefits to [the defendant] as well. . . . [that] were available only if [the witness] were called.").

Based on the record before this Court, Woods was the only source of information that McCrimmon and Minnitt confessed to committing the homicides with a Chachi whom Woods had never met, that Chachi wore a mask, and that McCrimmon had identified Chachi as living on the street where Martin Garza testified to living. Petitioner has not shown that the state PCR court was unreasonable in concluding that the value of this testimony to Petitioner's mistaken identity defense outweighed the dangers of calling Woods to testify even if Woods might testify to further information implicating Petitioner in the triple homicide, especially considering that, as discussed below, significant fingerprint evidence already connected Petitioner to the crimes.[17]

---

[17] Petitioner cites a number of out-of-circuit cases that he says show that counsel is ineffective when he or she opens the door to otherwise inadmissible evidence. *See*, *e.g.*, *Ward v. United States*, 995 F.2d 1317,

Indeed, Stuehringer testified during state PCR evidentiary hearings that he decided to go ahead and call Woods as a witness even after the trial court ruled that Woods' November 20, 1992 statement would be admissible at trial because the inconsistencies between Woods' two statements provided Stuehringer with an opportunity to "dirty up" Godoy and suggest that Godoy was feeding information to Woods after September 8, 1992, to further implicate Petitioner, a course of action by Stuehringer consistent with the related defense

---

1322 (6th Cir. 1993); *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001); *Goodman v. Bertrand*, 467 F.3d 1022, 1029–31 (6th Cir. 2006); *White v. Thaler*, 610 F.3d 890, 899–900 (5th Cir. 2010). However, those cases – two of which are direct review cases – either involve scenarios in which the attorney's initial decision which opened the door to otherwise inadmissible, inculpatory evidence was deemed not sound strategy (sometimes because the attorney actually admitted he or she had no strategy in pursuing a particular course of action) or involve circumstances where an attorney's performance comprised a catalog of errors which together resulted in prejudice to the defendant. In contrast, here, the state PCR court was reasonable in concluding that Stuehringer's initial decision to pursue a mistaken identity defense using Woods was reasonably strategic, despite some of the negative consequences which ensued, especially because fingerprint evidence already linked Petitioner to the crime and because Stuehringer was otherwise able to challenge the veracity of Woods' later, more inculpatory statements linking Petitioner to Chachi, as addressed *infra*. *Cf. Edwards v. Lamarque*, 475 F.3d 1121, 1127–29 (9th Cir. 2007) (en banc) (state court decision finding counsel's conduct objectively reasonable owed deference where counsel asked defendant to explain his suspicious behavior testified to by his wife even though such risky questioning resulted in waiver of marital privilege and wife's further testimony about defendant's inculpatory statements to her about murder, especially considering state otherwise had strong case against defendant). In addition, none of the cases Petitioner cites involves the Supreme Court's elucidation of *Strickland*. *Andrade*, 538 U.S. at 71–72 ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." (citation omitted)).

strategy (as reflected in the trial record) of casting Godoy as an overzealous detective who repeatedly misrepresented and mishandled evidence in Petitioner's case.

Petitioner agrees that the inconsistencies between Woods' two primary statements strongly show that Godoy fed Woods information on November 20, 1992, and that Stuehringer could have mitigated the harmfulness of calling Woods as a defense witness if Stuehringer was able to elicit those inconsistencies and argue them to the jury. However, he contends that Stuehringer failed on this account too. But, while Petitioner may demonstrate that Stuehringer was far from perfect in his exploitation of the differences between Woods' September 8, 1992 and November 20, 1992 statements, he overstates the case in saying that Stuehringer wholly failed to argue such differences to the jury. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

For example, Stuehringer repeatedly emphasized to the jury during opening and closing arguments that Woods only claimed to have met Chachi and identified Chachi as "Martin" and "Betty Christopher's boyfriend" on November 20, 1992, *after* Godoy had misrepresented in a telephonic search warrant affidavit and during a juvenile court transfer hearing that Woods had identified Petitioner as Chachi, said that Petitioner confessed to the murders, and said that Petitioner had the murder weapon – information which undisputedly was not included in Woods' initial September 8, 1992 statement. Indeed, Stuehringer elicited from Godoy that, after Godoy met with Woods on September 8, 1992, but before their second meeting on November 20, 1992, Godoy

made these misstatements in a telephonic search warrant affidavit and during a juvenile court transfer hearing.

Moreover, Stuehringer elicited from Woods that, some time after Woods gave his September 8, 1992 statement to law enforcement, Woods went into hiding in an attempt to renege on his deal to aid in the prosecution of the El Grande homicides until he was taken into custody on November 20, 1992, the date on which he gave his second statement to Detective Godoy. Stuehringer also elicited from Woods that Woods had not spoken to Minnitt or McCrimmon a second time after Woods made his September 8, 1992 statement to Godoy, implying that it was strange for Woods to remember additional facts allegedly provided by Minnitt and McCrimmon connecting Chachi to Petitioner over two months later when Woods ostensibly should have had such information during his initial meeting with Godoy. Stuehringer likewise attempted to elicit from Woods, a hostile witness, that Woods spoke with Godoy off tape on November 20, 1992, and that Woods added details to his November 20, 1992 statement and later statements to law enforcement which were not included in his September 8, 1992 statement.

Stuehringer further elicited from Woods that he had seen via television or the newspaper that Petitioner had been arrested in this case by the time Woods gave his second November 20, 1992 statement to law enforcement in which Woods claimed to have met Chachi at Bridget Lucero's house and physically identified Petitioner as Chachi. As a result, Stuehringer implied to the jury that Petitioner's arrest subsequent to Woods' first statement improperly informed Woods' belated identification of Petitioner as Chachi. In other words, the trial record demonstrates that Stuehringer did take steps to mitigate the harmful effects of Woods'

November 20, 1992 statement by eliciting testimony from Godoy and Woods suggesting that, on November 20, 1992, Godoy had an incentive to feed incriminating information to a receptive Woods who needed to make good on his deal to provide law enforcement with information about the El Grande homicides in exchange for the dismissal of the drug charges against him.

Petitioner further argues that the state PCR court's decision denying his ineffective assistance of counsel claim was unreasonable because Stuehringer did not have to call Woods at all to introduce a suspected Chachi into the trial who could be tied to Martin Garza.[18]  In particular, Petitioner suggests that Stuehringer could have simply asked Godoy whether he suspected a Chachi of committing the triple homicide, in much the same way that Peasley asked Godoy if he obtained the name "Martin Soto" from Detective Zimmerling on August 31, 1992.  That is, Petitioner asserts that Stuehringer could have asked Godoy about the contents of his investigative reports in which Godoy represented receiving the name "Chachi" from Zimmerling and a confidential source.

---

[18] As part of this argument, Petitioner asserts that Stuehringer made an ill-informed representation to the trial court that Woods had to testify when the trial court asked if evidence implicating Chachi could come in through another witness. However, Petitioner misrepresents Stuehringer's exchange with the trial court judge.  The judge did not ask Stuehringer in a general or open-ended manner if there was any way evidence of a Chachi could come in without putting Woods on the witness stand.  Instead, the judge specifically asked if Woods' September 8, 1992 statement could be introduced through a witness other than Woods, and Stuehringer said that he did not think that would be appropriate under applicable hearsay rules.

In response to this argument, the district court ruled that the prosecution likely would have successfully precluded Godoy from testifying to the contents of his investigative reports on hearsay grounds. However, even if a hearsay objection to Godoy's testimony would not have been made or passed muster, this Court also finds it probable that the state trial court would not have simply limited Godoy's testimony to whether he suspected a Chachi and prevented the prosecution from exploring in any fashion with Godoy his sources for that name and his suspicion of that individual. For example, when Stuehringer argued that Woods' testimony should be limited to his September 8, 1992 statement because of *Bruton* issues tied to the November 20, 1992 statement, the prosecution argued that such a limitation was unfair because the prosecution would have been hampered in cross-examination in its efforts to explore a full and accurate picture of who Woods understood Chachi to be in order to counter Petitioner's mistaken identity defense. The state trial court agreed.

In a similar fashion, if Stuehringer utilized Godoy as a defense witness and asked him whether he suspected a Chachi based on alleged hearsay information contained in his investigative reports, the prosecution likely would have successfully argued that Stuehringer's questioning opened the door to additional information about a Chachi contained in Godoy's reports, so that the prosecution could present a full and accurate picture on cross-examination about what those sources said related to a suspected Chachi in order to counter Petitioner's defense. *See*, *e.g.*, *State v. Woratzeck*, 657 P.2d 865, 867 (Ariz. 1982) (defendant's direct examination of a witness on topic opens door to further inquiry on topic during cross-examination); *State v. Mincey*, 636 P.2d 637, 653 (Ariz. 1981), *cert. denied*, 455 U.S. 1003 (1982) ("Arizona follows

the English or 'wide open' rule, wherein cross-examination may extend to all matters covered by direct examination . . . ." (internal citation and quotations omitted)). And that information was harmful to Petitioner's theory that Chachi was someone other than Petitioner. In particular, the undisputedly disclosed September 15, 1992 report states that a "Suspect Number 2 was described as a Mexican male named 'Martin Soto' also known as 'Cha-Chi,'" and that "Martin Fong" used the name "Martin Soto," thereby linking the name "Chachi" back to Petitioner. Similar information is contained in Godoy's allegedly undisclosed September 9, 1992 report, which states that "Martin Fong's AKA was listed as Martin Soto" and "that he also went by Cha-Chi."

In other words, Petitioner seemingly overstates how easy it would have been to introduce a suspected Chachi into the proceeding via Godoy and at the same time preclude the prosecution from exploring any other information related to a Chachi that might have implicated Petitioner. Instead, Stuehringer may have had to abandon entirely a mistaken identity defense based on Martin Garza being Chachi to prevent any evidence linking Chachi to Petitioner from coming in at trial.

Moreover, whether Stuehringer could have gotten the name Chachi introduced at trial through someone other than Woods still does not render unreasonable the state PCR court's decision denying Petitioner relief on his ineffective assistance of counsel claim. Again, the state PCR court found that Woods was a particularly critical witness for the mistaken identity defense because only his testimony suggested that Chachi wore a mask and linked the Chachi who Woods discussed with McCrimmon to the address of Martin Garza. As the state points out on appeal, having

Woods testify arguably showed the jurors: 1) why they should believe a Chachi committed the crimes – because Minnitt and McCrimmon confessed to committing the murders with a Chachi; 2) why the jury should believe that Chachi was not Petitioner – because Chachi wore a mask and lived at the location McCrimmon identified to Woods as Martin Garza's address; and 3) why the jury should disbelieve Godoy and mistrust Woods' second statement to law enforcement – because an overzealous Godoy was incentivized to coerce a reneging Woods into adding information incriminating Petitioner to Woods' November 20, 1992 and later statements.

Petitioner's argument that Stuehringer simply ignored the fingerprint evidence in pursuit of a mistaken identity defense when he should have also challenged that evidence based on the alleged sloppiness of the forensic investigation likewise is not supported by the record before this Court. Instead, the record reflects that Stuehringer obtained a fingerprint expert who confirmed the state's finding that the fingerprints found at the scene were Fong's. Nonetheless, through the cross-examinations of Godoy and his partner, Detective Karen Wright, Stuehringer engaged in a thorough attack of the forensic investigation.

For example, Stuehringer elicited testimony from Detective Wright confirming the oddity of the crime-scene investigators only locating Petitioner's fingerprints at the scene when one would expect that the store owner's and other store employees' fingerprints would also be found there. She also testified that her initial crime scene log only showed one foodstamp found by murder victim Fred Gee and a single plastic bag on the counter, contrary to later records showing that two plastic bags were found on the counter and that two

foodstamps were located near Mr. Gee's body. In addition, Stuehringer elicited from Detective Wright that she testified at the grand jury hearing that both foodstamps found near Mr. Gee's body had Fong's fingerprints on them, though evidence admitted at trial showed only one foodstamp bore Fong's fingerprints. Stuehringer further elicited from her that the Tucson Police Department deviated from its normal evidence-storage protocols in handling the items which bore Fong's fingerprints.

In a similar vein, Stuehringer questioned Godoy about his decision initially to store the evidence in this case outside of the normal location used by the police department for such evidence storage. Stuerhringer was also able to elicit from Detective Godoy a number of contradictory statements he gave throughout the case's prosecution about the fingerprint evidence, including: (1) that Godoy represented in a search warrant affidavit and during an under-oath phone call to a judge that the foodstamp bearing Fong's fingerprints was found in the cash register, rather than next to Fred Gee's body on the floor; (2) that Godoy also misstated in the search warrant affidavit that there was only one plastic bag on the counter when a photograph of the scene showed two bags; (3) that Godoy misrepresented under oath to a judge that Fong's fingerprints were found on the cucumber sitting on the market's checkout counter; (4) that Godoy incorrectly stated during a pretrial interview that no one at the crime scene had touched the plastic bags bearing Fong's fingerprints or removed the contents of those bags even though a crime-scene photograph showed that the forensic identification technician touched the bags and removed and dusted the cucumber and lemons found inside them at the crime scene; and (5) that Godoy misrepresented that the lemons found at the scene were taken back to the Tucson Police Department

for processing and that he saw the forensic identification technician with them at the station when the lemons actually were left at the crime scene.

In other words, though Stuehringer conceded that the fingerprints found at the scene belonged to Fong, he also took steps to show the jury that the fingerprint evidence was mishandled, misrepresented, and possibly even manufactured. Indeed, during closing argument, Stuehringer extensively argued that Godoy's inconsistent representations about the fingerprint evidence, as well Godoy's and the police department's deviations from proper evidence handling and storage protocols, created reasonable doubt about whether the fingerprint evidence established Fong's culpability for the murders.

In addition, Petitioner has not shown that the state PCR court was unreasonable in condoning Stuehringer's risky decision to call Woods and not abandon the mistaken identity defense altogether when weighed against the fingerprint evidence connecting Petitioner to the crimes. While Petitioner tries to minimize that fingerprint evidence, the Arizona Supreme Court found it quite compelling evidence of guilt on direct review because the placement and location of Petitioner's fingerprints were consistent with them being left during the commission of the crime:

> Although defendant claims his prints could have been left in the store when he worked there several months before, this does not explain the presence of his prints on unstamped food stamps found on the floor next to the body of Fred Gee. Testimony indicated that the food stamps would have

been marked by the store on the day they were received. Also, the fingerprints found on the lemon and cucumber bags on the counter near Gee's body belonged to Fong, not Garza.

Although Fong may have touched baggies while working in the store months prior to the murders, or even while shopping in the store prior to the murders, it is highly unlikely that Fong unrolled a spool of plastic bags, placed his prints on a baggie, and then rolled it back up on the spool. Likewise, assuming Fong touched bags that were lying around the store, it is unlikely that days, weeks, or even months after Fong touched those two particular bags, the killer entered the store, found those same bags, and used them to carry lemons and a cucumber to the liquor counter where Gee was shot.

*Soto-Fong*, 928 P.2d at 623; *see also Mikes v. Borg*, 947 F.2d 353, 356–57 (9th Cir. 1991) (conviction based on fingerprint evidence alone may be sustained where sufficient evidence presented that fingerprints had to have been left on items during commission of the crime); *State v. Rodriguez*, 961 P.2d 1006, 1009 (Ariz. 1998) (conviction based on fingerprint evidence alone should be sustained where "jury could reasonably infer that the prints could only have been impressed when the crime was committed"). As a result, the state PCR court was reasonable in concluding that Stuehringer was justified in pursuing a risky mistaken identity defense as an attempt to diffuse the fingerprint evidence.

Petitioner also urges that Stuehringer's testimony before the state PCR court about his trial strategy is unworthy of belief because, at the time it was given, Stuehringer was a conflicted witness who was representing Peasley in the various state disciplinary proceedings related to Peasley's misconduct during the trials of Petitioner's co-defendants.[19] But, Stuehringer's representation of Peasley in those other proceedings, though unusual, does not render untrustworthy Stuehringer's testimony during a state PCR evidentiary hearing about his *own* trial performance. *See Weaver v. Palmateer*, 455 F.3d 958, 964–65 (9th Cir. 2006) (implicit credibility determinations made by state court in favor of defense attorney's testimony related to ineffective assistance of counsel claim owed AEDPA deference). And, upon this Court's review, the trial transcripts provided by Petitioner on appeal, including Stuehringer's opening statement, his closing argument, and his examinations of Woods and Godoy, support his characterization of his trial strategy before the state PCR court.

Because we find reasonable the state court's conclusion that Fong's counsel was not deficient in deciding to call Woods as a witness to pursue a mistaken identity defense, we refrain from addressing whether Fong was prejudiced by his counsel's performance.

Stuehringer's decision to call Woods as a witness in pursuit of a mistaken identity defense was unquestionably risky, and Stuehringer's presentation of that defense via Woods may not have panned out exactly how Stuehringer

---

[19] Petitioner's independent claim for relief centering on Stuehringer's representation of Peasley in those state disciplinary proceedings is addressed in the concurrently filed memorandum disposition.

hoped. However, giving proper deference to the state PCR court, "and even though we might reach a different conclusion under a different standard of review, we cannot say that [the state court's denial of Petitioner's ineffective assistance of counsel claim] was an objectively unreasonable application of *Strickland* to the facts of this case," or involved an unreasonable determination of the facts. *Edwards*, 475 F.3d at 1128–29.

## IV.    CONCLUSION

We affirm the district court's denial of Fong's habeas petition on the two certified issues addressed herein. The Arizona Courts did not engage in an unreasonable determination of the facts or an unreasonable application of controlling federal law when denying Petitioner's prosecutorial misconduct claim based on Godoy's trial testimony or Petitioner's ineffective assistance of counsel claim based on Stuehringer's decision to call Woods as a defense witness in pursuit of a mistaken identity defense.

**AFFIRMED.**

---

SCHROEDER, Circuit Judge, dissenting.

This is a very troubling and confusing case. The crime was a highly publicized triple murder-robbery in the Tucson area. Fong was only seventeen at the time the crime was committed. There were no eyewitnesses. The principal trial witnesses were hardly upstanding citizens. The police informant, Woods, had only recently been released from prison and, absent cooperation, would have soon been back

in prison on drug charges. The owner of the getaway car was a known cocaine user. The prosecution had very little direct evidence linking the three defendants, Fong, McCrimmon, and Minnitt, to the crime. McCrimmon's fingerprints were on the getaway car, and Fong's fingerprints were at the scene of the robbery. During the trial Fong was apparently referred to by several different names, including Chachi and Martinez, while another person, also named Martin, may also have been called Chachi.

What is now clear is that in order to bolster the dubious credibility of the informant, Woods, the prosecution knowingly put on perjured testimony of the police investigator, Godoy. While Godoy lied at the trials of all of the defendants, this fact came out only after Fong's conviction had become final and the convictions of the other two defendants had been reversed for juror coercion. In their retrials, where the perjury was disclosed, McCrimmon was acquitted, and Minnitt's jury hung, and he was eventually freed on double jeopardy grounds.

Fong's prosecutor was ultimately disbarred for the knowing use of perjured testimony in the original trials of Minnitt and McCrimmon. *See State v. Minnitt*, 55 P.3d 774 (Ariz. 2002). Fong, however, has served more than twenty years in prison for the murders.

The informant, Woods, provided damaging testimony in Fong's trial. The prosecution could not put Woods on the stand in Fong's trial because he would testify to the alleged confession of McCrimmon and Minnitt, whom Fong could not cross-examine. *See Bruton v. United States*, 391 U.S. 123 (1968) (holding that testimony recounting a co-defendant's confession violated the Confrontation Clause and due

process). Fong's own attorney called the informant as a witness, hoping, without any legal basis whatsoever, that he would be able to limit the testimony to identifying Minnitt, McCrimmon, and a person named "Chachi," and to exclude any description of "Chachi" that would identify him as Fong. The cherry-picking attempt failed. *See State v. Soto-Fong*, 928 P.2d 610, 618 (Ariz. 1996). Woods' testimony inevitably inculpated Fong.

It is, of course, quite possible that Fong would have been convicted without Woods' testimony. But with that testimony, there was no way that the jury could have failed to convict Fong. His own lawyer put the nail in his coffin. In the original appeal, the state Supreme Court opinion emphasized that Fong put Woods on as a witness, and disclaimed any intent to second guess the strategy. The court said:

> Having chosen a strategy which brought into issue portions of McCrimmon's and Minnitt's statements to Woods, defendant cannot complain that the court should have precluded the state from introducing additional portions of those same statements.

*Soto-Fong*, 928 P.2d at 618.

Fong raised multiple issues before the district court, but the district court correctly identified the two most important for certification on appeal: the knowing use of the perjured testimony of Godoy, and the conduct of defense counsel in calling Woods to the stand.

The majority accurately explains that Godoy's false testimony played a lesser role in Fong's trial than it did in the later trial of McCrimmon and Minnitt. Godoy, in order to bolster Woods' credibility, lied about learning for the first time from Woods about the trio's involvement. The lie was less critical here than in the other trials because there was strong evidence, apart from Woods' statements, that Fong was involved. There was thus less need to bolster Woods' credibility. Godoy's testimony nevertheless reinforced Woods' testimony and out-of-court statements that implicated Fong and that were key to his conviction.

It is also probable that had Fong's attorney not put Woods on the stand to testify about what Woods told the police, the perjured testimony of Godoy as to the importance of Woods' statements would have played a more important role in Fong's trial, and become nearly as important as Godoy's perjury was in the trials of McCrimmon and Minnitt, perjury that eventually resulted in their walking free. If Fong's attorney had not called Woods, the jury would have been able to assess the credibility of Woods' statements only by assessing the credibility of Godoy.

Because the jury convicted Fong after a trial marked by perjury and incompetence, I conclude that Fong did not receive a fair trial. The district court should have granted him habeas relief. 28 U.S.C. § 2254(d).

I therefore respectfully dissent.